# FARMERS & MERCHANTS STATE BANK OF PIERZ v. ST. PAUL FIRE & MARINE INSURANCE COMPANY.

242 N. W. 2d 840.

May 28, 1976—No. 46134.

---

*Meagher, Geer, Markham, Anderson, Adamson, Flaskamp &
Brennan, O. C. Adamson II, R. D. Blanchard,* and *John H. Riley,*
for appellant.

*Rider, Bennett, Egan, Johnson & Arundel, Richard J.
Nygaard,* and *William J. George,* for respondent.

Heard before Rogosheske, Peterson, and Yetka, JJ., and considered and decided by the court en banc.

ROGOSHESKE, JUSTICE.

This appeal raises the issue of whether the issuer of a bankers fidelity bond is obligated to indemnify the insured bank for legal expenses incurred by the bank in defense and settlement of a customers' suit for damages alleging fraudulent acts on the part of the bank and three of its officer-directors. Contrary to the trial court's determination, we hold that the stipulated facts, including the allegations of the customers' complaint and facts dehors the complaint known to the insurer, establish that the alleged fraudulent acts were perpetrated jointly by the bank and its officer-directors. Accordingly, the bank is not entitled to recover on the bond for the legal expenses so incurred. We therefore reverse and order judgment for defendant insurer.

In the spring of 1970, the Catholic parish of Pierz decided to offer its elementary school for sale at public auction. Ernest R. Benusa and Richard N. Bujalski (the customers) were interested in obtaining the school for renovation into an apartment building. On April 24, 1970, they went to the Farmers & Merchants

State Bank of Pierz (the bank) and spoke to Dennis J. Feda, the cashier of the bank, about the prospects for a real estate loan to help finance the project. On May 8, 1970, they met with F. L. Spanier, assistant vice president of the bank, and also discussed the proposed loan. By this time, William T. Stoll, the bank's president and 90-percent stockholder, was also aware of the customers' plans to purchase and renovate the school property. At all times relevant, the bank's board of directors consisted of Feda, Spanier, Stoll, and Mrs. Stoll.

The church senate, a board of about 25 members, had the responsibility for deciding to whom and at what price the property would be sold. Feda, Spanier, and Stoll were all members of the senate. After the customers had made a presentation of their desire to purchase the property and renovate it to the senate on April 28, 1970, at a senate meeting at which Feda was present, the bank became interested in purchasing the property itself to construct a new bank. The customers had stated at the meeting that they would offer $3,000 for the property, and although the bank's officers knew from the senate reaction that the bank could buy the property itself for that amount, they decided to offer $10,000.

The officers realized that their decision to buy the property for the bank created a conflict of interest between the bank and the customers. They decided to inform the customers, if they ever called again at the bank, that the bank was submitting a bid itself. The customers did not contact the bank between May 8 and June 2, and they first learned of the bank's bid on the morning of June 2, about 25 minutes before the bids were to be received. At the auction the senate accepted the bank's bid of $10,000, rejecting the customers' $3,000 bid. Those were the only bids submitted.

The customers sued the bank, Feda, Spanier, and Stoll, alleging breach of a fiduciary relationship. St. Paul Fire & Marine Insurance Company had issued a bankers fidelity bond policy

to the bank.[1] St. Paul Fire & Marine declined to defend the bank when the suit was tendered to it. Consequently, the bank undertook the defense of itself and its officers, settling the action after a partial trial and incurring legal fees of $5,730.14. The bank then sued St. Paul Fire & Marine in an attempt to recover this amount. The trial court awarded the bank judgment for $5,730.14 with interest from the date that amount was paid by it.

The Minnesota law concerning an insurer's duty to defend was concisely summarized in Bituminous Cas. Corp. v. Bartlett, 307 Minn. 72, 75, 240 N. W. 2d 310, 312 (1976):

"We review some basic law concerning the nature of the insurer's obligation to defend its insured. The obligation to defend is contractual in nature and is generally determined by the allegations of the complaint against the insured and the indemnity coverage afforded by the policy. Republic Vanguard Ins. Co. v. Buehl, 295 Minn. 327, 332, 204 N. W. 2d 426, 429 (1973). However, the complaint is not controlling when actual facts clearly establish the existence or nonexistence of an obligation to defend.

---

[1] The insurance policy contained the following provision:

"INSURING CLAUSES

"(A) DISHONESTY

"The Underwriter agrees to indemnify the Insured to any amount not exceeding the amount stated in the Declarations for this Insuring Clause, or endorsement amendatory thereto, from and against any loss, or any loss of Property, by reason of any dishonest, fraudulent or criminal act of any of the Employees, wherever committed and whether acting alone or in collusion with others, but this Insuring Clause does not cover—

"(a) Any loss resulting from any act or acts of any director of the Insured other than one employed as a salaried, pensioned or elected official or an Employee of the Insured, except when performing acts coming within the scope of the usual duties of an Employee, or while acting as a member of any committee duly elected or appointed by resolution of the board of directors of the Insured to perform specific, as distinguished from general, directorial acts on behalf of the Insured."

Crum v. Anchor Cas. Co. 264 Minn. 378, 119 N. W. 2d 703 (1963) ; Bobich v. Oja, 258 Minn. 287, 104 N. W. 2d 19 (1960) ; Weis v. State Farm Mutual Auto. Ins. Co. 242 Minn. 141, 64 N. W. 2d 366 (1954). If any part of the cause of action against the insured arguably falls within the scope of coverage, the insurer must defend. Christian v. Royal Ins. Co. 185 Minn. 180, 240 N. W. 365 (1932). Any ambiguity as to coverage at the pre-trial stage is to be resolved in favor of the insured. As we said in Crum:

" 'Whether an insurer is under an obligation to defend is not always free from doubt until the case is actually tried. Such doubts should be resolved in favor of the insured.' 264 Minn. 390, 119 N. W. 2d 711.

"From the above authorities, it is apparent that an insurer seeking to avoid having to defend an insured carries the burden of demonstrating that all parts of the cause of action against the insured fall clearly outside the scope of coverage. If any part is arguably within the scope of coverage, the insurer should defend, reserving its right to contest coverage based on facts developed at trial on the merits. See, F. D. Chapman Const. Co. v. Glens Falls Ins. Co. 297 Minn. 406, 211 N. W. 2d 871 (1973)."

Thus while the insurer must as a rule defend any suit which alleges a claim within coverage, if the insurer has knowledge from facts dehors the complaint that the acts giving rise to the suit are outside the coverage of the policy, there is no duty to defend.[2]

A bankers fidelity bond is intended to protect a bank from losses sustained as a result of dishonest, fraudulent, or criminal acts on the part of its employees.[3] It is broad enough "to cover

---

[2] Weis v. State Farm Mutual Auto. Ins. Co. 242 Minn. 141, 64 N. W. 2d 366 (1954); Crum v. Anchor Cas. Co. 264 Minn. 378, 119 N. W. 2d 703 (1973); Bituminous Cas. Corp. v. Bartlett, 307 Minn. 72, 240 N. W. 2d 310 (1976); Keeton, Insurance Law, § 7.6(a).

[3] The customers' suit charged fraud, dishonesty, and breach of fiduci-ary relationship, but these allegations were never proved since the cus-

loss by dishonest or fraudulent acts and conduct of the employe whereby the employer is rendered liable to third parties." Citizens State Bank v. New Amsterdam Cas. Co. 177 Minn. 65, 70, 224 N. W. 451, 453 (1929). However, a bankers fidelity bond does not cover losses suffered by reason of fraud, dishonesty, or breach of fiduciary duty when a bank, through its board of directors, had knowledge of the acts complained of, appreciated their fraudulent nature, and condoned, acquiesced, or participated in them.[4] Were it otherwise, the bank would be insured against its own dishonesty. We are aware of no authority for construing a fidelity bond in such a manner.[5]

It is undisputed that in the instant case the active members of the bank's board of directors (Feda, Spanier, and Stoll) were aware of the transactions which had taken place between the customers and the bank's loan officers (Feda and Spanier) at the time it was decided by formal resolution of the board of directors that the bank should buy the property for itself. Feda and Spanier had represented the bank in its dealings with the cus-

tomers' suit was settled. The events described are those upon which the customers based these charges, and they are recited only to determine if the allegations of the complaint, if proved, would have alleged a claim within the coverage of the bond and for which a duty to defend existed even though the customers' allegations were groundless. We note that the insurer and the bank are "in complete agreement that none of the acts committed by the bank and its employees were actually criminal, fraudulent or dishonest."

[4] See, Parker v. Sprague, 193 Wis. 338, 214 N. W. 361 (1927); Citizens' Guaranty State Bank v. National Surety Co. 242 S. W. 488 (Tex. Civ. App. 1922); Farmers' & Merchants' State Bank of Verdon v. United States Fidelity & Guaranty Co. 28 S. D. 315, 133 N. W. 247 (1911). Cf. Fidelity & Cas. Co. v. Hoyle, 64 F. 2d 413 (4 Cir. 1933).

[5] The Fourth Circuit Court of Appeals has stated: "* * * The parties to the bond did not mean to insure the corporation against losses which might be caused by its own dishonesty or crime, but merely to protect it against the dishonesty or crime of its employees. A policy of fidelity insurance does not insure an employer against his own fraud." Levey v. Jamison, 82 F. 2d 958, 960 (4 Cir. 1936).

tomers, Stoll knew of the arrangements, and all three were on the church senate—the body which would decide to whom the property was sold. They also recognized the conflict of interest when they decided the bank itself should buy the property, yet they did nothing to eliminate that conflict. Under the foregoing authority, the acts giving rise to the bank's alleged liability were acts of the directors, and thus acts of the bank. Since the policy was not intended to insure the bank against acts taken by its directors which they knew could create an allegation of liability for conflict of interest, there is no coverage for this liability under the bond. Therefore, under the rule of Weis, Crum, and Bituminous, there was no duty on the part of the insurer to defend.

The bank argues that the customers' complaint included allegations which, if true, would set forth a claim within coverage. The customers' complaint alleged dishonesty on the part of the bank's employees as well as of the bank itself. If the facts at trial had established that the board of directors had no knowledge of the relationship which existed between the customers and the bank's employees at the time it decided the bank should buy the property for itself, or if the employees, without the knowledge of the board of directors, had obtained confidential information from the customers and used it to their detriment, then there would have been coverage under the policy.[6]

However, it is undisputed on this record that the board of directors had knowledge of the confidential relationship and was aware of the conflict of interest later charged by the customers. All of the acts complained of were committed by the bank; none

---

[6] In the absence of knowledge of the dishonest or fraudulent nature of the acts involved, the board of directors cannot ratify the fraudulent actions of its employees so as to make those acts the bank's acts and thus take them outside of the coverage of the bond. Franklin Sav. & Loan Co. v. American Employers Ins. Co. 99 F. 2d 494 (5 Cir. 1938); Fidelity & Deposit Co. of Maryland v. Bates, 76 F. 2d 160 (8 Cir. 1935); National Surety Co. v. State, 90 Ind. App. 205, 161 N. E. 573 (1928).

of the acts committed by its employees were unknown to the board. Under the rule of Weis, Crum, and Bituminous, when it is established by the insurer that the facts are such that there is no coverage under the policy for any resulting liability, no duty to defend arises even if the complaint can be read to allege a set of facts which, if proved, would be within coverage.[7]

Our disposition of this case makes consideration of the other issues raised by the parties unnecessary.

Reversed.

MR. JUSTICE OTIS took no part in the consideration or decision of this case.

---

[7] As stated in Keeton, Insurance Law, § 7.6(a), p. 467: "* * * Consider, next, the case in which a surplus allegation will, if credited, establish coverage but the insurer, if allowed to do so, can prove that the facts were contrary to the allegation. Again it would seem that the surplusage should not control. To hold otherwise is to invite undercover deals, lack of candor, and manipulation of the tort pleadings as a device for involving an insurer who could not otherwise be involved. The insurer should be permitted to prove a state of facts contrary to the surplusage and decisive against the duty to defend."