**S.G., Respondent,**

v.

**ST. PAUL FIRE & MARINE INSURANCE COMPANY,**
**Appellant.**

**No. C4–90–925.**

Court of Appeals of Minnesota.

Sept. 25, 1990.

Review Denied Nov. 28, 1990.

Robert G. Share, Alan H. Maclin, Briggs & Morgan, Minneapolis, for respondent.

William M. Hart, Shirley Okrent Lerner, Meagher & Geer, Minneapolis, for appellant.

Considered and decided by SHORT, P.J., and LANSING and THOREEN, JJ.*

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

## OPINION

SHORT, Judge.

This matter is on appeal from the entry of summary judgment in favor of the insured, S.G., in a coverage case involving tortious transmission of genital herpes. St. Paul Fire & Marine Insurance Company argues the trial court erred in its application of the law. The insured challenges an order denying his request for attorney fees incurred in prosecuting the trial court action, and requests attorney fees on appeal. We affirm in part, reverse in part and remand.

## FACTS

The insured learned in 1980 that he had contracted herpes II, a sexually transmitted disease. He believed, based on medical advice, that he could transmit the disease only when he was experiencing lesions in his genital area. In March of 1988, the insured had sexual relations with two women on separate occasions. The insured had no lesions in his genital area at the time, but may have had lip lesions. (He also suffers from herpes I.) Both women experienced symptoms of herpes II soon after sexual contact with the insured. Neither woman had previously experienced herpes symptoms, and the insured believed he was the only sexual partner either woman had had in the period in which they were infected.

The women met in October of 1988, and somehow learned each had been infected with herpes II soon after having sex with the insured. On December 30, 1988, the women confronted the insured and demanded $75,000 each, and said they would seek much higher amounts if they were forced to file lawsuits.

The insured obtained counsel, and on January 4, 1989, notified his insurance company of the claims against him for "negligent transmission of a genital herpes simplex virus." The insured's attorney and the company exchanged communications frequently over the next few weeks. The company initially refused to take a position on coverage. The insured pressed the company for a decision, stating the women were threatening a lawsuit for substantially larger amounts than they were currently seeking. The company requested interviews and medical records of the women and the insured. The insured complied with the company's requests, giving several statements to the company. The women, however, refused to comply until the insured guaranteed them payment of damages.

On January 18, the company agreed to investigate the claims with a full reservation of rights. The company explained that coverage might be denied under the intentional acts exclusion, or because of a public policy against providing coverage for transmission of a contagious disease.[1]

On February 15, an attorney hired by the women made a settlement demand for $50,000 each, plus attorney fees. In return, the women offered to cooperate fully with the company's investigation. The letter imposed a deadline of February 17. The insured immediately forwarded this demand letter to the company, and requested the company assume the defense and agree to provide coverage. On February 17, the company again refused to accept coverage, stating it had insufficient information. The company agreed, however, to provide a defense "if and when a complaint is made." The company refused to participate in the settlement negotiations.

Later that day, the insured's attorney informed the company that the insured would settle the claims for $43,000 each, plus attorney fees and costs, on February 20. The insured indicated that he would seek reimbursement from the company.

On February 20, the women signed the settlement agreement for the amounts stated above. On February 24, the insured

---

1. We note that the position St. Paul took as to coverage had no legal basis. *See North Star Mutual Ins. Co. v. R.W.*, 431 N.W.2d 138 (Minn. App.1988), *pet. for rev. denied* (Minn. Jan. 13, 1989) (holding insurer has a duty to defend insured against negligent transmission of herpes claim; intentional transmission will not be inferred as a matter of law; coverage of this type does not violate public policy).

signed it. The women agreed to cooperate fully with the company so that the insured could obtain indemnification. A supplemental agreement executed at the same time promised the women that the insured would drop his suit against the company if it became necessary to avoid publicizing their identities in open court. The agreement also assured the women they would not have to release certain information, such as the identities of their past sexual partners.

On April 7, the insured commenced this action against the company, alleging breach of contract and seeking damages, costs and attorney fees. The insured granted the company an indefinite extension of time to complete its investigation and to agree to indemnify the insured. The company scheduled depositions of the women, at which time their medical records would have been available, but later cancelled them because the company's attorney had to leave town. The company never rescheduled the depositions.

On August 25, the insured moved for summary judgment. After a hearing on the motion, the company moved for summary judgment. The trial court ruled its motion untimely, and the company does not challenge this ruling. On November 14, the trial court granted summary judgment for the insured. On January 19, the trial court denied the insured's request for attorney fees incurred in pursuing the company. Also on that date, judgment was entered against the company for $86,000 plus prejudgment interest; $7,701.55 for the women's attorney fees; and $19,321.01 for the insured's attorney fees incurred in settling the women's claims.

## ISSUES

I. Did the trial court err in granting summary judgment for the insured?

II. Did the trial court err in refusing to award the insured attorney fees incurred in prosecuting this action?

III. Are attorney fees incurred in this appeal authorized?

## ANALYSIS

### I.

In his complaint, the insured alleges the company breached (a) its duty to defend, which caused the insured to incur legal expenses in defending himself; and (b) its duty to indemnify the insured for the amounts he paid to the claimants. The company denies it breached its duty to defend, and contends it is relieved of any duty to indemnify because the insured settled the claims in violation of the cooperation clause of the policy.

#### A. Duty to defend.

■ Construction of language in an insurance contract is a question of law for the court. *Iowa Kemper Ins. Co. v. Stone*, 269 N.W.2d 885, 886–87 (Minn.1978). An insurance policy should be construed as a whole, with all doubts about the meaning of its language resolved in favor of the insured. *Canadian Universal Ins. Co. v. Fire Watch, Inc.*, 258 N.W.2d 570, 572 (Minn.1977).

The company correctly observes that in every case discussing the insurer's duty to defend, the duty arose when litigation commenced. However, the duty to defend arises by contract. *Farmers & Merchants State Bank of Pierz v. St. Paul Fire & Marine Ins. Co.*, 309 Minn. 14, 17, 242 N.W.2d 840, 842 (1976). Thus, the parties are free to make the duty to defend arise before suit is commenced.

■ The insured argues the following policy language creates an ambiguity as to when the duty to defend arises.

> We'll be responsible for your defense and related investigation, negotiation or settlement. * * * The details of this are spelled out in "What Else We Will Do For You."

This language appears to bind the company to assume the defense regardless of whether a suit has been commenced. However, the company argues that the general language must be read in connection with the specific language set forth in the section entitled "What Else We Will Do For You." We agree. That section provides, in part:

We'll defend any suit for damages against you or anyone else insured even if it's groundless or fraudulent. And we'll investigate, negotiate and settle on your behalf any claim or suit if that seems to us proper and wise.

This language binds the company to settle pre-litigation claims only if the company decides the action is "proper and wise." Thus, the company had no contractual duty to assume the defense before litigation commenced. The policy is not ambiguous. Our conclusion compels reversing all damages awarded for the breach of the duty to defend. These damages are the costs of settlement, set at $19,321.01.

### B. Duty to indemnify.

■ The company argues it had no duty to indemnify the insured after he settled the claims without prior authorization. A settlement by the insured without the insurer's involvement is binding on the insurer only if: (1) the insured did not violate its contractual duty to cooperate with the insurer; (2) the settlement is not the product of fraud or collusion; and (3) the settlement is reasonable and prudent. *Miller v. Shugart*, 316 N.W.2d 729, 732–33 (Minn. 1982).

#### 1. Contractual duty to cooperate.

The policy provides:

If you've made a settlement we've agreed to and you've paid the claimants personally, we'll reimburse you for what we owe you.

This clause does not prohibit the insured's conduct. However, the policy also contains the following clause:

If we decide to enter the negotiations or suit, help us in any way you can.

This clause is inapplicable because the company did not enter negotiations. Finally, the policy provides:

You must do everything you can to preserve your rights of recovery.

Although we have doubts about whether these provisions are specific enough to impose a duty barring unilateral settlement of claims, we will assume for our analysis that they do, and that the insured violated this duty.

■ In order for a violation of the duty to cooperate to void the policy, however, it must be a substantial and material breach which prejudices the insurer. *Miller*, 316 N.W.2d at 733 n. 1. *Miller* held that an insurer who is disputing coverage cannot compel the insured to forego a settlement which is in the insured's best interests. 316 N.W.2d at 734. The court held that a settlement made before the insurer acknowledges coverage is not a violation of the cooperation duty. *Id.* The company cites cases which follow *Sargent v. Johnson*, 551 F.2d 221 (8th Cir.1977) in holding the unilateral settlement of a claim voided the policy. These cases are inapplicable because the insurer in each case admitted coverage before the settlement, and agreed to defend the insured. *Id.* at 230; *Buysse v. Baumann–Furrie & Co.*, 448 N.W.2d 865, 873–74 (Minn.1989); *Steen v. Underwriters at Lloyds*, 442 N.W.2d 158, 162 (Minn.App.1989), *pet. for rev. denied* (Minn. Aug. 15, 1989). Once the insurer acknowledges coverage, the insured is not permitted to settle the claim without authority from the insurer. However, as the *Buysse* court recognized:

Only the insurer's denial of the existence of *any* coverage for the claim and the resultant exposure of the insured to liability for the entire amount of any damage award provide a basis for requiring the insurer's right to the insured's cooperation to yield to the insured's need to extricate himself or herself without the insurer's agreement.

448 N.W.2d at 872 (emphasis in original). This is precisely the situation here. The company had originally stated it might deny coverage altogether, and never retracted its position. Although the company eventually agreed to provide a defense, it reserved the right to deny coverage, and did not state what coverage, if any, it would agree to provide. As the company had not accepted coverage, the *Sargent*-type cases are inapplicable.

We think the fact situation here is more similar to that in *Miller*. The insured

faced possible punitive damages, claims for emotional distress, and public exposure. He knew, based on his own attorney's advice and that of the opposing counsel, that jury awards in these types of cases typically exceed $100,000 per claimant. He also knew he was the only source of transmission of the disease. He knew the company had initially asserted it might deny coverage under the intentional acts exclusion or for public policy reasons, and had never conceded liability (although it eventually conceded a duty to defend). It was clearly in the insured's best interest to settle the claims as he did. Thus, under *Miller* there was no breach of the duty to cooperate.

■ If there was a breach, the issue becomes whether it was material, and prejudiced the company. The company argues it was prejudiced by the "secret side agreement" which supposedly compromised its ability to investigate the claim. We disagree. The side agreement assured the claimants they would not be required to disclose certain information, and gave the claimants recourse against the insured if the agreement was breached. We conclude the agreement does not compromise the company in any conceivable way. If the claimants had withheld information from the company by invoking the side agreement, we might conclude otherwise. The company cannot complain of the side agreement until it is actually hampered in its efforts to investigate the claim. Further, in the settlement agreement itself the claimants agreed to cooperate fully with the company. The insured's attorney scheduled depositions of the women, who promised to produce their medical records. The company's attorney cancelled the depositions because she had to go out of town, and she never attempted to reschedule them. Thus, there is no prejudice from any breach.

2. The alleged fraudulent nature of the settlement.

■ The second protection *Miller* provides the insurer is from judgments obtained by fraud or collusion. 316 N.W.2d at 734. The company argues that the misconduct was (1) settling without knowing the value of the claims; (2) withholding from the company the information necessary to evaluate the claims; and (3) entering the secret side agreement which compromised the company's ability to investigate.

The first claim is obviously not in the nature of fraud or collusion, although it may go to the reasonableness of the settlement. The second allegation is not supported by any facts. The record does not disclose that the company ever made a demand for information. The record is replete with testimony from the insured that he related all information in his possession to the company. The third allegation of misconduct is also unsupported. The settlement itself guaranteed full cooperation by the claimants with the company. The company is not prejudiced by the side agreement.

3. Reasonableness of the settlement.

The third protection *Miller* affords the insurer in cases where the insured settles without authority is against settlements that are not reasonable and prudent. 316 N.W.2d at 734–35. The burden of proof is on the insured to show the settlement is reasonable and prudent. *Id.* at 735. The issue is a question of law. *Traver v. Farm Bureau Mutual Ins. Co.*, 418 N.W.2d 727, 732 (Minn.App.1988), *pet. for rev. denied* (Minn. Apr. 15, 1988). The test is whether a reasonably prudent person in the position of the insured would have settled for the amount of the settlement. *Miller*, 316 N.W.2d at 735.

> This involves a consideration of the facts bearing on the liability and damage aspects of plaintiff's claim, as well as the risks of going to trial.

*Id.*

The insured came forward with evidence which prima facie showed the settlement was objectively reasonable. This evidence includes opinions in affidavits by several attorneys, together with respondent's knowledge of the facts relating to his negli-

gence.[2] The company, despite an opportunity to depose the claimants, failed to come forward with any evidence that the amount settled for was unreasonable. The only evidence as to reasonableness shows that the insured's potential liability far exceeded the settlement amount. Thus, summary judgment was proper on the issue of the reasonableness of the settlement.

In conclusion, the settlement is binding on the insurer because it was not in violation of the cooperation clause, was untainted by fraud or collusion, and was reasonable and prudent. No material fact disputes exist.[3] We therefore affirm the award of damages flowing from the breach of the duty to indemnify. This amount was set at $86,000.00 (the amount paid to the claimants) plus $7,701.55 (the amount paid to the claimants' attorneys).

## II.

■ The insured filed a notice of review challenging the trial court's refusal to award him attorney fees incurred in prosecuting this action against the company. Attorney fees incurred in forcing an insurer to meet its contractual obligations are authorized. *See Economy Fire & Casualty Co. v. Iverson*, 445 N.W.2d 824, 827 (Minn.1989); *Lanoue v. Fireman's Fund American Ins. Cos.*, 278 N.W.2d 49, 54–55 (Minn.1979); *Morrison v. Swenson*, 274 Minn. 127, 138, 142 N.W.2d 640, 647 (1966). These costs are conceptualized as damages flowing from the breach of the duty to indemnify. *Brown v. State Automobile & Casualty Underwriters*, 293 N.W.2d 822, 825–26 (Minn.1980). We therefore reverse the trial court's denial of these damages and remand for determination of the attorney fees respondent reasonably incurred in this action.

## III.

■ The insured argues attorney fees incurred on appeal should be awarded as part of the expense of forcing the company to indemnify him. We agree. *See Brown*, 293 N.W.2d at 825. Thus, the trial court should include the costs of this appeal in awarding attorney fees incurred in this action.

## DECISION

The trial court's grant of summary judgment for the insured on the breach of the duty to defend is reversed. The grant of summary judgment for the insured on the breach of the duty to indemnify is affirmed, and remanded for inclusion of attorney fees incurred in compelling the company to meet its contractual obligation to indemnify. Reasonable attorney fees incurred in this appeal should be included in the award.

Affirmed in part, reversed in part and remanded.

THOREEN, Judge, dissenting.

I respectfully disagree with the majority's holding that the company breached its duty to indemnify the insured. It is my opinion that by entering into the unilateral settlement in this case, the insured substantially violated his duty to cooperate and violated the policy.

The majority's conclusion is based upon a finding that the insured is entitled to the benefit of the *Miller v. Shugart*, 316 N.W.2d 729 (Minn.1982), doctrine. However, this case differs in certain critical respects. First, in *Miller* a lawsuit had been commenced so the insured knew the exact nature of the claims being made. This also afforded the insurer the right to

2. It is worth noting that this court had recognized a cause of action for negligent transmission of herpes in August, 1988. *R.A.P. v. B.J.P.*, 428 N.W.2d 103, 108 (Minn.App.1988), *pet. for rev. denied* (Minn. Oct. 19, 1988). This court specifically held a person who knows he has herpes has a duty to warn his or her sexual partners. *Id.* Thus, any legal defense respondent might have raised was unlikely to succeed.

3. The company argues, in a separate section, that the "issue of whether plaintiff had any liability to the claimants" is a disputed fact issue requiring remand for a trial. However, *Miller* does not permit a separate action after a settlement has occurred. The insurer is bound to the settlement if the three tests of *Miller* are satisfied. *See St. Michel v. Burns & Wilcox, Ltd.*, 433 N.W.2d 130, 134 (Minn.App.1988), *pet. for rev. denied* (Minn. Mar. 17, 1989).

depose the claimants and access to medical and other records needed to determine liability and evaluate the claims. No case in Minnesota has been brought to our attention confirming a unilateral settlement made *before* a suit was started.

Second, in *Miller*, the settling insured protected himself completely from any personal liability. In this case, the insured had a $1,000,000 policy, so there was no chance of any economic loss because of damages awarded for "negligently transmitting herpes." If the facts relating to the sexual contacts with the two claimants are as insured asserts, the possibility of the claimants recovering punitive damages in this case is so remote, that protection against such claims cannot justify the settlement. No case in Minnesota has been cited confirming a unilateral settlement that did not provide a substantial *economic* benefit to the insured. It is true, as the majority point out, that the settlement may have protected the insured from public exposure, but the insurance policy does not purport to protect his "reputation," only his "pocketbook."

Moreover, in this case, the company cannot be faulted for delay. Barely six weeks transpired between the first notice of claim and the settlement on February 20, 1989. The first direct notice from claimants (by letter from their attorney) that they were claiming negligent transmission of herpes was received by the company on February 15, 1989. On February 17, 1989, the company notified the insured that it would defend him on such claims. While the company did not specifically admit coverage, at no time did it *deny* coverage for a negligence claim. It did reserve its rights under the policy in the event a forthcoming complaint alleged an intentional tort or punitive damages, which was proper. *See Steen v. Underwriters at Lloyds*, 442 N.W.2d 158, 161 (Minn.App.1989), *pet. for rev. denied* (Minn. Aug. 15, 1989).

It appears from the record that the company began an investigation of the claims early in January, soon after first notice. However, their investigation was limited to what information the insured could or would reveal. He would not furnish the names of the claimants nor could he furnish their medical records. It would seem that in order to determine liability and evaluate these claims, the company was entitled to know, at the very least, whether the claimants had ever been infected with or exposed to herpes through other sexual partners. The only information available to the company in this regard on February 20, 1989 was the insured's opinion and that was based on what the claimants had told him. The company's repeated position that it could not participate in settlement discussions without further information was entirely reasonable.

The supreme court has refused to extend the *Miller v. Shugart* doctrine. In *Buysse v. Baumann–Furrie & Co.*, 448 N.W.2d 865, 872 (Minn.1989), which involved a dispute as to applicable limits of liability, the court held that the unilateral settlement voided the contract of insurance and stated:

> Only the insurer's denial of the existence of *any* coverage for the claim and the resultant exposure of the insured to liability for the entire amount of any damage award provide a basis for requiring the insurer's right to the insured's cooperation to yield to the insured's need to extricate himself or herself without the insurer's agreement.

*Id.*

It is my opinion that in a case such as this where (1) the insurer has not *denied* coverage, and (2) the insurer has agreed to defend if a lawsuit is started, and (3) the insured has been unable to investigate the claims sufficiently to determine liability or evaluate the damages, due to insured's failure to cooperate, it was not unreasonable for the insurer to refuse to participate in a settlement and that the unilateral settlement entered into by the insured voided the contract of insurance.