TRANSAMERICA INSURANCE
COMPANY, Appellant,

v.

FEDERAL DEPOSIT INSURANCE
CORPORATION as Receiver of
Beaver Creek State Bank, Respondent,

Myron A. Kruse, Respondent.

No. C6-90-1025.

Court of Appeals of Minnesota.

Feb. 5, 1991.

Review Granted April 29, 1991.

R.D. Blanchard, Thomas H. Crouch, Meagher & Geer, Minneapolis, for appellant.

Brian E. Palmer, Michael A. Lindsay, Dorsey & Whitney, Minneapolis, John D. Scholl, Worthington, for respondent.

Considered and decided by GARDEBRING, P.J., and RANDALL and DAVIES, JJ.

## OPINION

DAVIES, Judge.

Appellant insurer argues its fidelity bond did not cover actions of the bank's president/owner and that there was no loss within the meaning of the bond. Appellant also argues that the trial court should not have granted summary judgment and should have allowed amendment of the complaint. We affirm.

## FACTS

Using borrowed money Myron A. Kruse purchased a majority of the stock of the Beaver Creek State Bank (BCSB), becoming its president and chairman of its board of directors. Kruse's ownership reached 93.5 percent. In May 1983 BCSB purchased a fidelity bond from appellant Transamerica Insurance Company.

Evaluation of BCSB in 1984 revealed "problem loans" which the regulators instructed Kruse to write off or write down. Instead, Kruse sold $400,000 in certificates of deposit and deposited the funds into BCSB's correspondent account at Independent State Bank (ISB). He did not record the sale on the BCSB books. From the correspondent account, Kruse transferred $300,000 to his individual account at BCSB and used part of the money to make payments on the "problem loans." He also applied $50,000 from the account at ISB against loans BCSB had extended to his sons.

Kruse later recorded on BCSB books two fictitious deposits of $25,000 into his account. Because these deposits showed up as BCSB liabilities to Kruse, he made entries on the BCSB books showing that balancing monies were in the BCSB corresponding account at First Bank of Sioux Falls (Sioux Falls) and wired the money from the BCSB corresponding account at ISB to the BCSB corresponding account at Sioux Falls. Meanwhile, Kruse used money from his account to "factor" certain BCSB problem loans.

During January 1986 bank regulators discovered the BCSB CD obligations and ordered an equivalent encumbrance on BCSB capital to satisfy them. Also, Kruse was forced to resign from the bank's board of directors and as president. Pursuant to an April 1986 "purchase agreement" Kruse tendered his BCSB stock to ISB, which in turn forgave a $230,706.87 loan to him. Two months later, Kruse plead guilty to the temporary taking of BCSB funds and to falsifying BCSB records.

Appellant subsequently commenced this declaratory judgment action against BCSB and Kruse seeking a determination that there was no coverage for Kruse's actions under the fidelity bond, alleging Kruse was not an "employee" under the bond. BCSB and Kruse counterclaimed seeking a declaration of coverage. Respondent FDIC was appointed as a receiver for BCSB and Kruse in March 1987 and is now a named party in this action. The trial court issued several partial summary judgments ruling that appellant's bond covered the situation, that Kruse was an employee under the bond, that he committed dishonest/fraudulent acts as a result of which the bank lost money, and that appellant was liable for at least $377,010.18 plus prejudgment interest. The trial court denied summary judgment regarding $50,000. After a bench trial regarding this $50,000, the trial court found all of it was covered by appellant's fidelity bond.

## ISSUES

1. Did the trial court err in concluding that Kruse was an "employee" under the terms of appellant's fidelity bond?

2. Did the insured bank suffer a loss within the meaning of appellant's fidelity bond?

3. Did an issue of material fact exist when the trial court granted summary judgment regarding Kruse's alleged fraud?

4. Did the trial court abuse its discretion by refusing to let appellant amend its complaint?

## ANALYSIS

### I.

■ The main issue here is whether the fidelity bond covers the actions of Kruse, the bank's majority share owner. Initially, we note that the real party in interest is the FDIC, the claimant to the remaining assets of the bank. Kruse is out of the picture. Because the bond protects the entity of the bank and not its former owners, we affirm the trial court conclusion that the unfaithful act of the bank president was covered by the bond.

Appellant argues that the "alter ego" doctrine precludes fidelity bond coverage of a majority shareholder as an employee, citing *Farmers and Merchants State Bank of Pierz v. St. Paul Fire & Marine Ins. Co.*, 309 Minn. 14, 242 N.W.2d 840 (1976), and *Red Lake County State Bank v. Employer's Insurance of Wausau*, 874 F.2d 546 (8th Cir.1989).

In *Pierz* a bank's customer sued alleging breach of the bank's fiduciary duty to the customer. By claiming coverage, where the wrongdoing was by the bank through its president against bank customers, the *Pierz* bank improperly attempted to convert its fidelity bond coverage into a liability policy. Here, there is no attempt at coverage conversion. We conclude that the trial court's refusal to equate Kruse, a controlling shareholder, with BCSB, the controlled corporation, is consistent with *Pierz*. Thus, because employee Kruse performed functions for the bank, but cannot appropriately be equated with it, the trial court did not err in ruling him to be covered by the fidelity bond as to action he took against the interests of the bank.

*Red Lake* is consistent with this distinction. There, a bank's majority shareholder was sued in fraud and the insurer refused to defend. The federal district court dismissed the owner's subsequent action for attorney fees ruling, inter alia, that Minnesota law did not allow recovery on a fidelity bond where a majority shareholder's acts "were not done with the manifest intent to cause a loss to the [b]ank * * *." *Red Lake*, 874 F.2d at 549. The Eighth Circuit affirmed *Red Lake* though on other grounds. 874 F.2d at 549.

The existing precedents do not allow a bank officer to pretend to act for a bank by borrowing money in the bank's name, paying the proceeds into his personal account, paying off personal, family, and friends' debts, and concealing the financial condition of the bank so he can hang on longer as its president. The acts here were "against" the bank and covered by the bond.

### II.

Generally,

[o]n appeal from a summary judgment it is the function of [an appellate court] only to determine (1) whether there are any genuine issues of material fact and (2) whether the trial court erred in its application of the law.

*Betlach v. Wayzata Condominium*, 281 N.W.2d 328, 330 (Minn.1979). *See also* Minn.R.Civ.P. 56.03; 56.05. Further, "the nonmoving party has the benefit of that view of the evidence which is most favorable to him." *Nord v. Herreid*, 305 N.W.2d 337, 339 (Minn.1981) (quoting *Sauter v. Sauter*, 244 Minn. 482, 484–85, 70 N.W.2d 351, 353 (1955)).

■ Here, appellant's fidelity bond insured BCSB against

loss * * * resulting directly from *dishonest or fraudulent acts* committed by an Employee * * *.

Dishonest or fraudulent acts as used in this Insuring Agreement shall mean only dishonest or fraudulent acts committed by such Employee with the manifest intent

(a) to cause the Insured to sustain such loss, and

(b) to obtain financial benefit for the Employee.

An "employee" includes "an officer or other employee of the Insured." In examining this fidelity bond language, we must recall that it is construed strongly against the insurer and that "the words are given a broad significance." *Prior Lake State Bank v. National Surety Corp.*, 248 Minn.

383, 393, 80 N.W.2d 612, 619 (1957) (quoting 50 Am.Jur., Suretyship, § 335).

Here, tracing of the money deposited into Kruse's personal checking account reveals payments made to payees other than BCSB (a personal farm loan; the personal stock loan; a consolidation loan; an implement company; a tire company; a credit card; and cash to Kruse). Similarly, while much of the remaining money did not ultimately leave BCSB, it was applied against loans BCSB made to Kruse, to a former Kruse business partner, to write down certain "over line loans" and $50,000 was used to make payments on real estate loans to Kruse's sons. Construing this record most favorably to appellant, but also remembering that embezzlers intend to repay all "temporarily" misappropriated monies, Kruse's conduct demonstrates an intolerable disregard for established banking rules, regulations, and laws. As a person is deemed to intend the natural consequences of his actions, and as here the natural consequence of Kruse's bank fraud was a loss to the bank (*see* issue III below), we see no possibility for genuine dispute regarding whether Kruse's actions are covered by the bond.

■ Appellant also argues that it should not be liable for the interest on the CDs. We again must disagree. While Kruse was generally empowered to issue CDs for BCSB, the reason they were issued here was so he could use their proceeds in his fraud scheme. Logically, with Kruse's dishonesty as the basis for the CD's issuance, the interest thereon is covered by the bond. Note that the CD obligations, both principal and interest, are claims against the FDIC.

### III.

Appellant argues that because

Kruse *owned* virtually all of [BCSB'S] capital or equity. Virtually all of the capital used to satisfy the [CDs] was therefore paid by Kruse.

(Emphasis added.) We disagree.

We cannot say that Kruse "owned" the money in the capital account. *See Milwaukee Motor Transportation Co. v. Commis-*

*sioner of Taxation,* 292 Minn. 66, 71, 193 N.W.2d 605, 608 (1971) ("[a corporation] owns its own property, and it must answer for its own contractual obligations"). Further, this argument ignores the fact that the bond also insured the minority interests and ultimately both the depositors and the FDIC. Finally, we note that it would be inconsistent were we to hold that the actions of Kruse and BCSB could not be equated, while their monies could.

Citing *Bangor Punta Operations v. Bangor and Aroostook R.R.,* 417 U.S. 703, 710–11, 94 S.Ct. 2578, 2583, 41 L.Ed.2d 418 (1974), appellant argues that equity precludes recovery because Kruse "sold" the BCSB stock for approximately $400,000 less than the value of the capital account. Under *Bangor Punta*

equitable principles might not prevent recovery where the effects of the wrongful acts continued and resulted in injury to present shareholders.

*Bangor Punta,* 417 U.S. at 711 n. 6, 94 S.Ct. at 2583 n. 6. Here, BCSB was a going concern when ISB acquired its stock but BCSB has since gone into bankruptcy. We must conclude that the effects of Kruse's conduct "continued and resulted in injury."

Alternatively, appellant argues that because certain funds did not leave BCSB or ultimately ended up back at BCSB, the bank did not suffer a loss. We disagree. The cases relied upon by appellant, *In re Schluter, Green & Co.,* 93 F.2d 810 (4th Cir.1938), and *Calistoga Nat'l Bank v. Fidelity & Deposit Co.,* 5 Cal.App.2d 248, 42 P.2d 1051 (1935), are distinguishable.

Alternatively, if in fact the loans which were deemed "bad" and to which Kruse applied the CD proceeds turn out to be "good," we note that appellant ultimately will not suffer a loss for under the bond, it is subrogated to BCSB's "rights of recovery." It must pay what looks like a loss today and make a recovery by subrogation, if it can, tomorrow.

### IV.

■ Twenty-eight months after the initiation of the action, appellant moved to

amend its complaint to include new allegations. Appellant alleges that the trial court's denial of this motion was an abuse of discretion. We disagree.

■ Leave to amend pleadings is to be "freely given when justice so requires," Minn.R.Civ.P. 15.01, and is discretionary with the trial court depending on the stage of the action. *See Tomlinson Lumber Sales v. J.D. Harrold Co.,* 263 Minn. 470, 474–75, 117 N.W.2d 203, 207 (1962); *Metag v. K–Mart Corp.,* 385 N.W.2d 864, 866 (Minn.App.1986) *pet. for rev. denied* (Minn. June 23, 1986). Further, while prejudice to the adverse party is an important consideration in the amendment decision, *Wilson v. City of Eagan,* 297 N.W.2d 146, 151 (Minn. 1980), "merely having to defend against an additional claim or defense" does not constitute sufficient prejudice to preclude amendment. *See Envall v. Independent School Dist. No. 704,* 399 N.W.2d 593, 597 (Minn.App.1987) *pet. for rev. denied* (Minn. Mar. 25, 1987).

In denying appellant's motion, the trial court cited *Local 472 Etc. v. Georgia Power Co.,* 684 F.2d 721, 724 (11th Cir.1982), where a party attempted an amendment to avoid summary judgment, and *Mitsubishi Aircraft Int'l, Inc. v. Brady,* 780 F.2d 1199, 1203 (5th Cir.1986), where a motion to amend was denied because the trial court had already granted summary judgment and there was the appearance of "a lack of diligence * * * or a lack of sincerity." The trial court then stated that "[t]o some extent, these arguments are applicable here." While this analysis does not go directly to prejudice, it does not suggest reversing the denial.

The trial court also addressed the viability of appellant's proposed amendments. Regarding the fraud claim, the trial court stated that "[appellant] does not specifically state what representations were misleading." *See* Minn.R.Civ.P. 9.02 ("In all averments of fraud * * * the circumstances constituting fraud * * * shall be stated with particularity."). As the "factoring" of loans is not uncommon in banking, the trial court stated that "[t]he act of 'loan factoring' does not constitute a 'dishonest or fraudulent act' under the bond." Finally, the trial court rejected appellant's "set off" theory as it was premised upon the appropriateness of the already rejected "alter ego" argument. Under these circumstances we cannot say that the trial court abused its discretion in refusing to allow amendment of appellant's complaint.

DECISION

The trial court did not err in refusing to equate Kruse's conduct with that of BCSB in determining that the fidelity bond covered the instant losses or in concluding that there was no genuine dispute regarding a material issue of fact. Further, the trial court did not abuse its discretion in refusing to allow modification of the complaint.

Affirmed.