ST. PAUL FIRE & MARINE
INSURANCE COMPANY,
Appellant,

v.

NATIONAL COMPUTER SYSTEMS,
INC., Respondent.

No. C4–92–427.

Court of Appeals of Minnesota.

Sept. 8, 1992.

Review Denied Nov. 17, 1992.

Timothy P. Tobin, Gislason, Dosland, Hunter & Malecki, Minnetonka, for appellant.

Daniel P. O'Keefe, C. Ann Olson, Thomas H. Gunther, Dorsey & Whitney, Minneapolis, for respondent.

Considered and decided by
SCHUMACHER, P.J., and HUSPENI and FORSBERG, JJ.

## OPINION

SCHUMACHER, Judge.

Appellant St. Paul Fire & Marine Insurance Company brought this declaratory judgment action seeking a determination whether it was obligated to defend and indemnify its insured, respondent National Computer Systems, Inc. (NCS), as a result of a lawsuit brought against NCS by Boeing Computer Systems. NCS moved for summary judgment, which the trial court denied, determining there were fact issues in dispute. NCS then requested reconsideration, which the trial court granted, determining that the presence of factual disputes required St. Paul Fire to provide a defense. The trial court denied summary judgment on the indemnification issue. Following further discovery, St. Paul Fire and NCS brought cross-motions for summary judgment. The trial court granted summary judgment in favor of NCS,

awarding NCS damages plus interest and $1,814,434 in attorney fees. St. Paul Fire has appealed. NCS has filed a notice of review, contending prejudgment interest should accrue from March 3, 1988, the date NCS settled the underlying litigation, rather than from March 2, 1991. We affirm in part, reverse in part and remand.

## FACTS

NCS, a Minnesota corporation, provides computer products and services to government agencies. Boeing is engaged in the business of developing and supplying computer systems, computer software and personnel services relating to computers. In 1981, Boeing had a contract to provide computer services for the United States Department of Education involving development and implementation of computer systems for the department's guaranteed student loan (GSL) program. On June 29, 1981, Boeing hired Jerome Peters as a task manager for GSL software development and as the overall development manager on Boeing's GSL contract. Boeing was awarded a renewal GSL contract on December 7, 1983, following a competitive procurement process. Peters was involved in preparing Boeing's technical and cost submissions for the renewal GSL contract.

Peters remained involved with Boeing's GSL program until late January of 1986. During this time, Peters had access to confidential proprietary information of Boeing, including data relating to the technical and cost proposals submitted by Boeing to the Department of Education for the GSL renewal contract and pricing information relating to Boeing's personnel and contracting costs. Peters, as a condition of his employment with Boeing, signed a confidentiality agreement regarding Boeing's proprietary information. Peters left his employment with Boeing on January 23, 1986.

Contracts for the GSL program are of fixed duration; the industry knows when contracts are due to be re-bid. Although NCS had never bid for a GSL contract prior to 1987, NCS had been contemplating entering the bidding process for some years

as part of an overall corporate strategy to become as involved as possible in Department of Education programs.

In furtherance of its decision to bid on the 1987 GSL contract, NCS sought to hire individuals with knowledge and expertise in the GSL bidding process. In addition, NCS sought to "team" with subcontractors with the requisite knowledge and expertise.

One of the subcontractors with which NCS teamed was Advanced Technology, Inc. Jerome Peters had been hired by Advanced Technology on January 27, 1986. The team arrangement between NCS and Advanced Technology gradually fell apart. Peters had actively solicited employment with NCS and was eventually hired.

On May 1, 1987, the Department of Education promulgated a request for procurement, the commencement of a competitive bidding process. The bids in response to the May 1, 1987 request for procurement were due on June 29, 1987. Boeing and NCS submitted bids for the 1987 GSL contract.

On June 2, 1987, Boeing wrote to NCS regarding former Boeing employees who had been hired by NCS. The letters indicated to NCS that these employees were obligated to preserve the confidentiality of Boeing's proprietary information that the employees had acquired while employed by Boeing. A letter expressing similar sentiments was sent to Mr. Peters on June 3, 1987.

After NCS received letters from Robert Gullette, Deputy Counsel for Boeing, regarding NCS's hiring of former employees, NCS employees in Iowa City and Silver Springs, Maryland, were directed to destroy or return to Washington all copies of all Boeing documents. While NCS was in the process of drafting a response to Gullette's letter, NCS was advised by Boeing that Boeing had retained an outside law firm and that that firm had drafted a complaint against NCS which would be served if NCS did not immediately return materials Boeing claimed Peters had taken and provide a statement to Boeing that NCS had not used Boeing proprietary information in preparing its GSL bid proposal.

NCS responded to this letter, and on Friday, June 26, 1987, Boeing advised NCS that NCS's response was unacceptable. That afternoon, a complaint was filed in federal district court for the Eastern District of Virginia.

In its complaint, Boeing alleged Peters took a set of three-ring binders containing Boeing proprietary technical and pricing information to NCS. Boeing claimed that NCS used this proprietary and confidential information in formulating its proposed bid for the 1987 Department of Education GSL contract and that NCS knew or should have known that the information was confidential and could not properly be used by NCS. Boeing also alleged NCS hired former Boeing employees in order to misappropriate Boeing proprietary information and conspired to hurt Boeing's reputation with the Department of Education by "dishonest means." The original complaint alleged breach of contract by Peters, violation by Peters and NCS of Boeing's trade secrets, and unfair competition by Peters and NCS. Boeing sought to enjoin NCS from submitting its bid to the Department of Education the following Monday. This relief was denied.

In the course of the Boeing litigation, evidence regarding the activities of Jerome Peters surfaced. According to Boeing, Peters told potential employers that whoever hired him would have a competitive edge in bidding for the GSL contract because he could recruit two individuals who had worked on Boeing's proposal for the original GSL contract. In addition, Peters allegedly stated that he had taken information from Boeing that would allow a competitor to underbid Boeing. Peters allegedly showed a former Boeing employee working for a Boeing competitor five or six large blue and white three-ring binders which Peters stated contained critical information regarding Boeing's pricing of its GSL contract proposal.

Prior to being hired by NCS, at a meeting at NCS's Washington, D.C. office, Pe-

ters supplied NCS employees with copies of documents stamped "Boeing Proprietary."[1] The documents were photocopied by NCS employees. Subsequently, a copy of the photocopied documents was taken to NCS's Iowa City office. Three days later, additional Boeing documents were photocopied and sent to Iowa City. John Schneider, NCS's GSL manager, expressed concern about the Boeing documents because of the "Boeing Proprietary" stamp. Schneider asked a copy room clerk to make photocopies of the material; however, the clerk refused because of the "Boeing Proprietary" stamp. Schneider and other NCS employees either cut the Boeing legend from the documents or covered it. The documents were then copied and distributed to NCS personnel in Iowa City.

After receiving the complaint in the Boeing lawsuit, NCS forwarded the complaint to its insurance broker. The broker, in turn, submitted the complaint to St. Paul Fire. When St. Paul Fire denied coverage and refused to provide a defense, NCS paid for its own defense in the Boeing litigation. NCS incurred approximately $1.8 million in defense costs. On the eve of trial, in early 1988, Boeing and NCS reached an out-of-court settlement, the terms of which are confidential.

After Boeing and NCS reached their settlement, St. Paul Fire commenced the present declaratory judgment action. NCS moved for summary judgment, which the trial court denied, finding there were fact issues precluding summary judgment. NCS moved for reconsideration, contending that the presence of fact issues established St. Paul Fire's duty to defend. The trial court agreed with this argument and determined St. Paul Fire was obligated to provide a defense. Subsequently, on cross-motions for summary judgment, the trial court determined the St. Paul Fire policy provided coverage for the claims brought by Boeing and ordered St. Paul Fire to reimburse NCS for the defense costs and the settlement payment in the underlying

---

**1.** There was also evidence that Boeing stamped every document, even blank pages, "Boeing Proprietary."

litigation. The trial court also directed that prejudgment interest on the settlement payment was to run from March 2, 1991. St. Paul Fire has appealed. NCS has filed a notice of review, contending prejudgment interest should run from the date of the settlement agreement, March 2, 1988.

## ISSUES

1. Did the trial court err in determining the St. Paul Fire policy provides coverage?

2. Did the trial court err in determining St. Paul Fire was obligated to pay NCS's legal costs in the Boeing litigation?

## ANALYSIS

■ Summary judgment is appropriate when there is no genuine issue as to any material fact and a party is entitled to a judgment as a matter of law. Minn. R.Civ.P. 56.03. If issues of fact exist, the fact that the parties have brought cross motions for summary judgment will not obviate the need for trial of the factual questions. *Home Mut. Ins. Co. v. Snyder*, 356 N.W.2d 780, 783 (Minn.App.1984).

■ On review of a summary judgment, this court must determine whether there are any genuine issues of material fact and whether the trial court correctly applied the law. *Offerdahl v. University of Minn. Hosps. & Clinics*, 426 N.W.2d 425, 427 (Minn.1988). The parties do not contend that there are any issues of fact. The trial court's grant of summary judgment was based on its interpretation of an insurance policy, an issue of law. *Iowa Kemper Ins. Co. v. Stone*, 269 N.W.2d 885, 887 (Minn.1978). This court reviews issues of law de novo. *A. Chromy Constr. Co. v. Commercial Mechanical Servs., Inc.*, 260 N.W.2d 579, 582 (Minn.1977).

1. The St. Paul Fire policy provides that St. Paul Fire will defend and indemnify NCS for claims by third parties alleging "property damage." The policy defines "property damage" as:

> Any damage to tangible property of others that happens while this agreement is in effect. This includes loss of use of the damaged property resulting from the damage. Property damage also includes

loss of use of others' property that hasn't been physically damaged if caused by an accidental event that happens while this agreement is in effect.

At the center of the present case is the issue whether the claims by Boeing against NCS alleged damage to tangible property. St. Paul Fire contends the property at issue was intangible property, relying on the Minnesota Supreme Court's decision in *Magnetic Data, Inc. v. St. Paul Fire & Marine Ins. Co.*, 442 N.W.2d 153 (Minn. 1989). NCS contends the *Magnetic Data* decision is distinguishable and that this case is controlled by *Retail Sys., Inc. v. CNA Ins. Cos.*, 469 N.W.2d 735 (Minn.App. 1991), *pet. for rev. denied* (Minn. Aug. 2, 1991).

In *Magnetic Data*, the insured mistakenly erased computer information on computer disk cartridges it had been asked to inspect for defects. *Magnetic Data*, 442 N.W.2d at 154. In determining there was no coverage under the insurance policy at issue, the court in *Magnetic Data* stated:

> Since 1966, standard CGL policies have not covered damages to intangible property. * * * While the CGL policy here is written in a "plain meaning" style and differs from the standard CGL policy provisions that this court has considered in the past, we find that the intent to limit coverage to loss of use of tangible property remains. Therefore, absent clear language to the contrary, we decline to interpret this CGL policy to extend coverage to loss of use of intangible property.
>
> *We need not determine, however, whether the computer information is intangible or tangible property.* If the computer information is deemed intangible property, it is not within the policy coverage. If the information is deemed tangible property, it is still not covered because of the control of property exclusion cited above. Under this exclusion, property damaged while on the insured's premises for the purpose of being worked on is excluded from coverage.

*Id.* at 156 (emphasis added).

In *Retail Sys.*, the results of a voter preference survey were recorded on a com-

puter tape which was given to the insured for processing. *Retail Sys.*, 469 N.W.2d at 736. The tape was lost during remodeling of the insured's computer room. *Id.* In finding there was coverage, we stated:

At best, the policy's requirement that only tangible property is covered is ambiguous. Thus, this term must be construed in favor of the insured. Other considerations also support the conclusion that the computer tape and data are tangible property under this policy. The data on the tape was of permanent value and was integrated completely with the physical property of the tape. Like a motion picture, where the information and the celluloid medium are integrated, so too were the tape and data integrated at the moment the tape was lost.

*Id.* at 737. In *Retail Sys.*, both the information and the medium on which the information was stored were lost. *Id.* at 736. In the present case, there is no allegation that Boeing's information was lost, nor was Boeing's complaint in the underlying litigation based on the loss of the medium (three-ring binders) which contained the information. Boeing also did not claim loss of use of the information.

 The St. Paul Fire policy does not define "tangible property." In construing an insurance policy, as with any other contract, the court must give all terms used their plain, ordinary and popular meaning, so as to give effect to the parties' intention. *Davis ex rel. Davis v. Outboard Marine Corp.*, 415 N.W.2d 719, 723 (Minn.App. 1987), *pet. for rev. denied* (Minn. Jan. 28, 1988). The intention of the parties should be determined,

not by a process of dissection in which words or phrases are isolated from their context, but rather from a process of synthesis in which words and phrases are given a meaning in accordance with the obvious purpose of the * * * contract as a whole.

*Cement, Sand & Gravel Co. v. Agricultural Ins. Co.*, 225 Minn. 211, 215, 30 N.W.2d 341, 345 (1947), *quoted in Republic Nat'l Life Ins. Co. v. Lorraine Realty Corp.*, 279 N.W.2d 349, 354 (Minn.1979).

 When the language of an insurance policy is reasonably subject to more than one interpretation, the policy is ambiguous. *Columbia Heights Motors, Inc. v. Allstate Ins. Co.*, 275 N.W.2d 32, 34 (Minn. 1979). Whether the language of an insurance policy is ambiguous is a question of law. *Id.* Any ambiguity is to be resolved against the insurer and in accordance with the reasonable expectations of the insured. *Caledonia Community Hosp. v. St. Paul Fire & Marine Ins. Co.*, 307 Minn. 352, 354, 239 N.W.2d 768, 770 (1976). The dictionary definition of "tangible" is:

1. a. Discernible by the touch; capable of being touched; palpable. b. Capable of being treated as fact; real; concrete: *tangible evidence.*

*American Heritage Dictionary* 1242 (2d College ed. 1982).

 Boeing's claims against NCS alleged that NCS misappropriated Boeing proprietary information. Boeing was not suing NCS for Peters' misappropriation of the binders in which Boeing's information was kept; Boeing was suing NCS for taking information that gave NCS a competitive advantage over Boeing. Boeing had sought to keep the information in the binders confidential; it was the loss of the confidential nature of the information that led to Boeing's damages, not the loss of the binders containing the information. Peters' actions did not make the information unusable; they only deprived Boeing of the *exclusive* use of the information.

The information was in a tangible form; it was put on paper. However, the information itself was not tangible. Therefore, we conclude the Boeing complaint did not allege damage to tangible property covered under St. Paul Fire's policy.

 2. The trial court awarded NCS both the costs of its defense and indemnification. The duty to defend under an insurance policy is broader than the duty to indemnify. *St. Paul Fire & Marine Ins. Co. v. Briggs*, 464 N.W.2d 535, 539 (Minn.App.1990), *pet. for rev. denied* (Minn. Mar. 15, 1991). If any part of the cause of action against the insured is arguably within the scope of the policy's cover-

**632**

age, the insurer must defend. *Id.* at 539–40 (quoting *Johnson v. Aid Ins. Co.,* 287 N.W.2d 663, 665 (Minn.1980)).

■ The duty to defend an insured on a claim arises when any part of the claim is arguably within the scope of the policy's coverage. *Jostens, Inc. v. Mission Ins. Co.,* 387 N.W.2d 161, 165 (Minn.1986). An insurer seeking to avoid the duty to defend must show that all parts of the cause of action against the insured fall clearly outside the scope of coverage. *Id.* at 165–66.

■ An insurer's duty to defend is not determined exclusively by the allegations in the complaint. If the complaint states a cause of action excluded from coverage, but the insurer is aware of facts outside the complaint which establish the inapplicability of the exclusion, the insurer must defend. *Lanoue v. Firemans Fund Am. Ins. Co.,* 278 N.W.2d 49, 53 (Minn. 1979). By the same token, if the insurer is aware of facts outside of the complaint which conclusively establish that the acts giving rise to the claim are not covered under the policy, the insurer is not obligated to defend. *Farmers & Merchants State Bank of Pierz v. St. Paul Fire & Marine Ins. Co.,* 309 Minn. 14, 18, 242 N.W.2d 840, 843 (1976).

■ Even a subsequent determination that the conduct of the insured was excluded by the policy will not extinguish the insurer's duty to defend if any of the allegations of the complaint were arguably within the scope of insurance coverage. *See Economy Fire & Casualty Co. v. Iverson,* 445 N.W.2d 824 (Minn.1989).

■ In the present case, NCS presented a colorable claim for a defense. Whether Boeing's claims would ultimately require St. Paul Fire to indemnify NCS was an open question. Given the uncertainty over St. Paul Fire's obligations, St. Paul Fire should have provided a defense under a reservation of rights while it pursued a declaratory judgment action to determine whether the claims against its insured were covered.

The trial court awarded NCS all of its attorney fees, including fees incurred in unrelated litigation. After NCS was awarded the 1987 Department of Education GSL contract, Boeing filed a bid protest. NCS intervened in the bid protest to protect its contract. We must remand for a determination of what fees were incurred in NCS's defense, as opposed to satellite litigation, and for a determination of the reasonable fees to be allowed.

■ St. Paul Fire also contends it is not obligated to pay for the costs of a counterclaim raised by NCS in answering the Boeing complaint. We agree. To the extent it is possible to separate the fees associated with preparing and asserting an affirmative counterclaim from other defensive fees, St. Paul Fire is not obligated to pay for NCS's counterclaim. On remand, the trial court shall disallow any fees incurred in asserting NCS's counterclaim.

DECISION

Misappropriation of confidential proprietary information does not constitute property damage within the meaning of the St. Paul Fire policy. St. Paul Fire is, however, obligated to pay for the reasonable attorney fees its insured incurred in defending the claims against it. These fees do not include the fees arising from asserting NCS's counterclaim or fees incurred in related administrative proceedings.

Affirmed in part, reversed in part and remanded.