**TRANSAMERICA INSURANCE COMPANY, Appellant,**

v.

**FEDERAL DEPOSIT INSURANCE COR-PORATION as Receiver of Beaver Creek State Bank, and Myron A. Kruse, Respondents.**

**No. C6–90–1025.**

Supreme Court of Minnesota.

Sept. 4, 1992.

Rehearing Denied Oct. 13, 1992.

R.D. Blanchard, Thomas H. Crouch, Minneapolis, for appellant.

Brian E. Palmer, Michael A. Lindsay, Dorsey & Whitney, Minneapolis, for Federal Deposit Ins. Corp.

John D. Scholl, Worthington, for Myron A. Kruse.

WAHL, Justice.

This declaratory judgment action raises two issues: whether a bank is precluded from recovering on an employee fidelity bond for losses caused by the bank's president who is also majority stockholder and chairman of its board of directors; and the extent to which the insured bank suffered losses compensable under the bond. Appellant Transamerica Insurance Company (Transamerica) seeks a declaration of nonliability on the bond. Respondents Federal Deposit Insurance Corporation (FDIC) as receiver for Beaver Creek State Bank (BCSB), and Myron Kruse, the former president and majority stockholder of BCSB, seek to recover under the bond. The trial court and court of appeals, 465 N.W.2d 713, held Transamerica liable for the entire amount claimed under the bond. Transamerica appeals from those decisions. We affirm the court of appeals in part, reverse in part, and remand to the district court.

The Beaver Creek State Bank was located in Beaver Creek, Rock County, Minnesota. In 1974, Myron Kruse began to purchase stock in BCSB and by 1984 had acquired 93.5% of the bank's stock. He was the bank's president, chief executive officer, and chairman of the board of directors. As majority stockholder, he elected the other three members of the board of directors, one of whom was his son. As president of the bank, Kruse made credit, loan, investment, and personnel decisions. By his own admission, Kruse essentially ran the bank as his own business.

Kruse financed his purchase of the BCSB stock with a personal loan from Independent State Bank (Independent), pledging the stock as collateral. In the fall of 1984, Independent required Kruse to hire an accounting firm to evaluate the quality of BCSB's assets. The resulting report indicated that the quality of BCSB's loans had deteriorated to the point that subsequent bank examiners would probably find "some problems" with the bank. Having been informed of the deterioration of its collateral, Independent told Kruse he must reduce the outstanding balance of the loan or it would call the loan in.

Kruse knew that the bank was unlikely to become profitable soon enough to enable him to repay the loan within the time required by Independent. He also knew that the quality of BCSB's loan portfolio was so poor that he would not be able to raise enough money by selling his stock to repay Independent. Kruse concluded he had to improve the bank's financial position by reducing the balances on overline loans made by BCSB to several customers, and that he had to pay off some of his debt to Independent.

In January, April, and July 1985, Kruse, on behalf of BCSB, sold certificates of deposit (CDs) totalling $400,000 to the Minnesota State Board of Investments (MSBI). Kruse deposited the money received from MSBI in BCSB's correspondent account at Independent but did not record the liability on BCSB's books. In April 1985, Kruse transferred $300,000 of the MSBI money from the correspondent account at Independent to his personal checking account at BCSB. He then wrote checks on that account to repay a personal farm loan from the Federal Land Bank, interest and principal to Independent on his bank stock loan, and to various third parties for personal expenses. These payments totalled approximately $161,660.

Kruse also wrote checks totalling approximately $144,150 from his personal checking account payable to BCSB to pay off director loans to himself, his former business partner and bank director, Leonard Scholten, and Beaver Creek State Agency, an insurance agency Kruse owned. Kruse deposited the latter in the agency's checking account in BCSB and proceeded to write checks payable to BCSB to repay loans made by the bank to the agency and to purchase two overline loans from BCSB for $30,000 each. Kruse transferred $50,000 of the $100,000 remaining in BCSB's account at Independent directly to BCSB to repay two loans made to his sons, leaving $50,000 of MSBI money in the Independent account.

Kruse maintained a personal checking account at BCSB that he used as a "factoring account." The factoring account was

used to make cash advances to bank customers that effectively extended the customers' line of credit beyond the amount permitted by banking regulations. Kruse operated this account personally, charging the customer a percentage of the amount advanced as his profit for the factoring service and was repaid by the customers' accounts receivables. On two occasions, when the factoring account was overdrawn or running low, Kruse recorded transfers of $25,000 from another of BCSB's correspondent accounts at the First National Bank of Sioux Falls, South Dakota (Sioux Falls), into the factoring account at BCSB. There had not been any corresponding deposits into the Sioux Falls account, however, to cover those "transfers" into Kruse's factoring account. Kruse later transferred the remaining $50,000 of MSBI money from Independent to BCSB's correspondent account at Sioux Falls.

The FDIC discovered Kruse's misapplication of the MSBI funds during a routine examination in January 1986. When it learned that the $400,000 in CDs had not been recorded as liabilities on the bank's books, FDIC immediately ordered that $400,000 of the bank's capital account (comprising the shareholders' equity) be encumbered to cover that liability. Kruse immediately resigned as president and director of BCSB.

BCSB's board of directors accepted Kruse's resignation and kept the bank operating while it looked for a new president. Kruse apparently took no further part in the bank's operation and in April 1986, sold his 935 shares of BCSB stock to Independent. In exchange Independent released the debt of approximately $236,000 Kruse still owed on the initial stock loan. Two months later, Kruse pled guilty to theft[1] and two counts of falsifying bank records.[2]

Soon after being informed of Kruse's dishonest actions, BCSB's remaining board of directors put in a claim for $417,903.80 under a blanket bankers bond issued May 19, 1983, to BCSB by Transamerica. The blanket bond included coverage for employee fidelity. The relevant portions of the bond provided:

The Underwriter * * * agrees to indemnify the Insured for loss discovered during the Bond Period, resulting directly from dishonest or fraudulent acts committed by an Employee, acting alone or in collusion with others:

Dishonest or fraudulent acts as used in this Insuring Agreement shall mean only dishonest or fraudulent acts committed by such Employee with the manifest intent

(a) to cause the Insured to sustain such loss, and

(b) to obtain financial benefit for the Employee or for any other person or organization intended by the Employee to receive such benefit, other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment.

The bond defined the term "employee" to be "an officer or other employee of the Insured, while employed in, at, or by any of the Insured's offices or premises located in the United States." The bond specifically excluded coverage of "loss[es] resulting directly or indirectly from any acts of any director of the Insured other than one employed as a salaried * * * official * * * of the Insured." Kruse was a salaried official of BCSB.

After BCSB made its claim on the bond, Transamerica filed a complaint in district court against BCSB and Myron Kruse seeking a declaration of nonliability under the fidelity bond. BCSB cross-claimed against Kruse to recover the loss, and asked for a declaration of Transamerica's liability under the bond. The FDIC, having taken over as receiver for BCSB after its failure in 1987, replaced BCSB as the real party in interest and in its amended answer cross-claimed against Kruse and counterclaimed against Transamerica seeking recovery under the bond.

---

1. In violation of Minn.Stat. § 609.52, subd. 2(5).

2. In violation of Minn.Stat. § 300.61.

The district court awarded a series of partial summary judgments in FDIC's favor on all issues except as to whether the $50,000 involved in the factoring account constituted a loss to the bank.[3] After a bench trial the court found that the $50,000 used in the factoring account also constituted a loss to the bank and awarded judgment in favor of the FDIC. Final judgment totalling $593,005.80 was entered in favor of FDIC. The court of appeals affirmed the judgment of the district court. We granted review.

 Transamerica's primary argument is that the alter ego doctrine precludes the FDIC, as receiver for BCSB, from recovering under the bond. Transamerica asserts that, in the fidelity bond context, the alter ego doctrine stands for the proposition that "[t]he owner of a controlling interest in an insured corporation is not included in the term employees covered by a fidelity bond." 35 Am.Jur.2d *Fidelity Bonds and Insurance* § 16, (1967). Transamerica would distinguish this application from the alter ego doctrine applicable where a stockholder of a corporation disregards the corporate entity to such a degree that "the separate personalities of the corporation and the owners no longer exist" and the corporate veil may be pierced to reach stockholder for the corporation's debts. 1 *Fletcher Cyc. Corp.* § 41.10 (Perm.Ed. 1990). We set out the factors to be considered in determining whether the alter ego doctrine applies to disregard the corporate form in *Victoria Elevator Co. v. Meriden Grain Co.*, 283 N.W.2d 509, 512 (Minn. 1979). The trial court applied the *Victoria Elevator* factors[4] in evaluating Transamerica's alter ego defense and concluded

that there was insufficient evidence that Kruse and BCSB were so identical that the bank was precluded from recovering for losses caused by Kruse's misdeeds.

Transamerica argues that the trial court confused the distinction between the two alter ego doctrines and applied the wrong standard. The confusion, if any, is understandable because Transamerica's argument to the trial court on its motion for summary judgment framed the issue as one of corporate veil-piercing.[5] Transamerica argues in this court that the salient question in the fidelity bond context is whether the wrongdoer is in fact an employee of the corporation, under its direction and control, or whether he controls the corporation. Transamerica asserts that control may be found even if the majority stockholder observes all the corporate formalities so that the corporation's creditors may not pierce the corporate veil to reach him personally for the corporation's debts. When such control is shown, Transamerica argues that as a matter of law the controlling stockholder cannot be an "employee" of the corporation covered by the fidelity bond.

Despite Transamerica's assertion that application of the alter ego doctrine in this case is required by settled Minnesota law, we have never applied the doctrine to preclude coverage in a case where the defalcating employee is merely the majority stockholder and board member but the remaining directors were not involved in or knowledgeable of the dishonesty. Transamerica relies on *Farmers' & Merchants State Bank of Pierz v. St. Paul Fire & Marine Ins. Co.*, 309 Minn. 14, 242 N.W.2d

---

3. The trial court found on summary judgment that Kruse was an "employee" under the terms of the bond, that he committed dishonest and/or fraudulent acts causing the bank to sustain a loss, and that Transamerica was liable for $377,010.18 plus prejudgment interest. The liability was for losses caused by misappropriation of the MSBI money, overnight deposit interest, interest on the CDs paid by BCSB to MSBI, and for a tractor repossessed by the bank but converted by Kruse for his personal use.

4. Those factors include insufficient capitalization, failure to observe corporate formalities,

nonpayment of dividends, insolvency of the debtor corporation at the time of the transaction in question, siphoning of funds by the dominate shareholder, nonfunctioning of other officers and directors, absence of corporate records, and existence of the corporation as merely a facade for individual dealings. *Victoria Elevator*, 283 N.W.2d at 512.

5. *See Memorandum of Law* in Support of Plaintiff's Motion for Reconsideration, at 4–5, Dec. 23, 1988 (district court file).

840 (1976) (*Pierz*), a case in which three officers and directors of a bank became involved in a conflict of interest with a bank customer. We held in *Pierz* that "a bankers fidelity bond does not cover losses suffered by reason of fraud, dishonesty, or breach of fiduciary duty when a bank, through its board of directors, had knowledge of the acts complained of, appreciated their fraudulent nature, and condoned, acquiesced, or participated in them." *Id.* at 19, 242 N.W.2d at 843. Our holding was that the wrongdoing by a majority of the board of directors was attributable to the bank itself on a ratification theory, *id.* at 20 n. 6, 242 N.W.2d at 844 n. 6, not on an alter ego theory. We specifically stated:

If the facts at trial had established that the board of directors had no knowledge of the relationship which existed between the customers and the bank's employees at the time it decided the bank should buy the property for itself, or if the employees, without the knowledge of the board of directors, had obtained confidential information from the customers and used it to their detriment, then there would have been coverage under the policy.

*Id.* at 20, 242 N.W.2d at 844.

Transamerica has submitted no evidence that the BCSB board knew of or acquiesced in Kruse's dishonesty, or in any other way ratified Kruse's conduct; therefore, *Pierz* does not apply. Transamerica argues, however, that application of the fidelity bond alter ego doctrine does not depend on the board's ratification of the majority stockholder's misconduct but merely on his status as majority and "controlling" stockholder. Kruse was the master of the bank, not its servant according to Transamerica. Kruse, by his own admission, owned 93.5% of BCSB's stock; was the bank's president, chief lending officer, director, and chairman of the board; elected all other directors who served at his pleasure; set his own salary and gave himself bonuses; hired and fired employees. These facts, Transamerica argues, indicate that as a matter of law Kruse controlled the corporation and could not be its employee.

FDIC does not dispute that Kruse performed all of these functions. Despite Kruse's dominate role, however, FDIC contends that BCSB existed and functioned as an independent, legal corporate entity and was in fact controlled by the board of directors that knew nothing of Kruse's dishonest conduct. Affidavits from BCSB board members indicate that throughout Kruse's administration the board was actively involved in the bank's affairs. On the basis of the record before the court on summary judgment the trial court found that the board held regular meetings, kept minutes, and observed other corporate formalities. Furthermore, after Kruse's resignation, the board continued to operate the bank and actively sought a new president, even though Kruse did not sell his stock in the bank until several months later.

Transamerica has submitted no evidence to controvert the facts alleged in the directors' affidavits nor has it alleged that any members of the board other than Kruse knew or participated in his scheme. Transamerica relies on Kruse's testimony regarding his role in operating the bank as sufficient proof that Kruse was not under the control of the board of directors and thus not an employee of the bank for fidelity bond purposes. As the United States Court of Appeals for the Fifth Circuit has said, however, "While it may be true that in this small county bank, not unlike hundreds throughout the country, there was a controlling shareholder who was also an officer and who actually ran the bank, this is not to say that the directors abdicated their duties and responsibilities with which they were charged by law." *Federal Deposit Ins. Corp. v. Lott*, 460 F.2d 82, 88 (5th Cir.1972).

Because the burden of proving non-liability is on Transamerica, Transamerica must allege and support facts that show not only that Kruse ran the bank and owned almost all of its stock, but also that the board abdicated its control of the corporation to such a degree that Kruse ceased to be its employee. This it has not done. To the contrary, the affidavits of the

bank's directors allege that the board functioned properly throughout Kruse's administration and knew nothing of his defalcations until they were revealed by the bank examiners in January 1986. The fact that Kruse owned 93.5% of the stock in the bank and ran the bank as his own business is insufficient, without more, to show that the board abandoned its responsibility to oversee the bank. *See Seattle Int'l Corp. v. Commerce & Industry Ins. Co.,* 24 Wash.App. 108, 600 P.2d 612 (1979); *Federal Deposit Ins. Corp. v. Lott, supra; General Finance Corp. v. Fidelity & Casualty Co. of New York,* 439 F.2d 981 (8th Cir. 1971).[6] This conclusion is not inconsistent with the cases cited by Transamerica. *See United States Fidelity & Guaranty Co. v. Three Garden Village Ltd. Partnership,* 77 Md.App. 640, 551 A.2d 881 (1989); *Kerr v. Aetna Casualty & Surety Co.,* 350 F.2d 146 (4th Cir.1965); *McKee v. Great American Ins. Co.,* 316 F.2d 473 (5th Cir.) *cert. denied,* 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 62 (1963). In these cases, which precluded coverage, the critical distinguishing fact was that the defalcating employee was the *sole* shareholder. The trial court properly rejected the insurer's alter ego defense and granted summary judgment finding the insurer liable under the fidelity bond.[7]

■ The question remaining is whether the bank sustained a compensable loss in the full amount of the sum awarded by the trial court and affirmed by the court of appeals.[8] Transamerica does not dispute that the approximately $161,600 Kruse used to pay personal obligations to other banks and creditors was "lost" to the bank and is compensable under the bond. Transamerica does contend, however, that approximately $134,150 in MSBI funds Kruse applied against outstanding loans from BCSB to himself, his sons, his insurance agency, and his former business partner did not cause a loss to the bank. Transamerica argues that Kruse's application of the MSBI money to those accounts are not losses to the bank because Kruse merely moved money between accounts within the bank and the money at all times remained "in the bank." FDIC argues, and the trial court found, that Kruse's actions caused the bank to surrender its rights to collect the debts and therefore constituted a loss to the bank.

■ As claimant under the bond, FDIC has the burden of proving a loss occurred. The evidence of losses due to the purported loan repayments are checks Kruse wrote and entries on the bank's books indicating the loans were repaid with money FDIC traced to the unrecorded MSBI funds.

6. The only case holding that mere majority ownership of stock by the dishonest employee, without more, precludes recovery under a fidelity bond is *Red Lake County Bank v. Employer's Ins. of Wausau,* 874 F.2d 546 (8th Cir.1989). The *Red Lake* opinion, however, speaks of the dishonest employee as "a director" of the bank, thus making it unclear whether he was the sole director of the bank or one of several directors. However, assuming that the wrongdoer was not the only director, Transamerica is correct in arguing that *Red Lake* supports its position that a fidelity bond never covers the wrongful acts of a majority stockholder. However, *Red Lake,* a federal case purporting to apply Minnesota law, relied almost exclusively on *Pierz* and extended that case farther than any Minnesota court has done, is not controlling precedent here.

7. There is the equitable force of the argument that Transamerica should not be required to reimburse the bank for Kruse's thefts when he, as majority stockholder, would be the primary beneficiary, but that argument does not require a declaration of non-liability. To whatever extent it may appear that payment of the bond will benefit Kruse as the majority stockholder, Transamerica takes the bank's right to recover its loss from Kruse by subrogation and it will therefore be able to disgorge any enrichment he unjustly may receive from payment under the bond. Furthermore, Transamerica could have excluded Kruse from coverage under the bond and cannot now avoid liability because it failed to do so.

8. We decline to address Transamerica's argument that the FDIC-ordered charge of $400,000 to the bank's capital account constituted full repayment to the bank, thus vitiating any loss the bank might have otherwise suffered. Transamerica did not assert this theory until, two years after its initial complaint was filed, it moved the trial court to amend its complaint to add this defense. The trial court denied the motion and the court of appeals affirmed, holding the trial court did not abuse its discretion in denying leave to amend. Transamerica has not appealed that decision of the court of appeals and we decline to consider it here.

FDIC has not submitted any evidence that the bank surrendered its rights to collect the loans from the obligors, however. We are aware of no authority, and FDIC has cited none, holding that a debtor is released from a debt when money is stolen from one account in a bank and credited to the debtor's account in the same bank. To the contrary, see *In re Schluter, Green & Co.*, 93 F.2d 810, 812 (4th Cir.1938) (customer's money accepted by investment company's employee and unlawfully deposited in the company's bank account instead of investing it as directed by customer causes no detriment to the company and no loss compensable under the bond); *see also Calistoga National Bank v. Fidelity & Deposit Co.*, 5 Cal.App.2d 248, 42 P.2d 1051 (1935) (no loss when funds remained within bank's control and were merely transferred from one account to another).

FDIC argues that if Transamerica had raised this defense in the district court, FDIC would have produced the necessary documentation to prove that the bank did legally surrender its rights to collect on the loans; therefore, a remand for a trial on this disputed factual issue would be appropriate. We find a remand unnecessary. FDIC was awarded summary judgment on this issue based solely on Kruse's checks and bookkeeping entries showing the debts to have been paid. If FDIC had evidence that the bank in fact released the debtors of their obligation to repay the loans, it was obligated to submit that evidence in support of its motion for summary judgment and it did not do so. The trial court erred in awarding FDIC summary judgment for the funds Kruse applied in purported repayment of outstanding loans from the bank to himself, his sons, his insurance agency, and his former business partner.

█ Transamerica also argues that the $60,000 of MSBI funds Kruse transferred to his insurance agency and used to purchase two overline loans from the bank "stayed in the bank" and thus is not a loss. The trial court found that the money paid to Beaver Creek State Agency by Kruse and used to purchase the overline loans

from the bank did constitute a loss to the bank. We agree with the trial court. The sale of the loans to the agency appears to have been a legitimate, effective transaction, notwithstanding Kruse's ownership of the agency or the fact that the bank may have had to sell the overline loans in any case. The net effect to the bank was a $60,000 loss because the bank gave up its right to collect those loans to the agency.

Finally, Transamerica argues that the trial court erred in finding, after a bench trial, that the $50,000 involved in Kruse's factoring account constituted a loss to the bank. The trial court found that the $50,-000 transferred from Independent to BCSB's Sioux Falls account covered the two prior $25,000 transfers from Sioux Falls into the factoring account which was for Kruse's personal use and was thus lost to the bank. Even though Transamerica argues that subsequent "legitimate deposits" by Kruse's customers into the factoring account more than made up for the overdrafts, the trial court was not clearly erroneous in its finding and we will not disturb it.

In summary, we affirm the court of appeals in holding that the trial court properly granted summary judgment finding the insurer liable under the fidelity bond. As to whether the banks sustained a compensable loss in the full amount of the sum awarded by the trial court, we affirm in part, reverse in part and remand to the district court with instructions to recalculate the insurer's liability consistent with this opinion.

COYNE, J., took no part in the consideration or decision of this case.