EMPLOYERS REINSURANCE COR-
PORATION, Plaintiff, Appellant
and Cross–Appellee,

v.

Edean LANDMARK, Defendant,

Bert Holvik, Holvik Halvorson Insurance,
Inc. a North Dakota Corporation, Defen-
dants, Appellees and Cross–Appellants,

Bert Holvik & Associates, a defunct
Sole Proprietorship, Defendant.

Civ. No. 950291.

Supreme Court of North Dakota.

April 25, 1996.

Rehearing Denied May 29, 1996.

E.T. Conmy, III (argued), of Nilles, Hansen & Davies, Ltd., Fargo, for plaintiff and appellant Employers Reinsurance Corporation.

H. Malcolm Pippin (argued), of Nilles, Hansen & Davies, Ltd., Fargo, for cross-appellee Employers Reinsurance Corporation.

Wickham Corwin (argued), of Conmy, Feste, Bossart, Hubbard & Corwin, Ltd., Fargo, for defendant, appellee and cross-appellant Holvik Halvorson Insurance.

Leland F. Hagen (argued), of Lee Hagen Law Office, Ltd., Fargo, for defendant, appellee and cross-appellant Bert Holvik.

NEUMANN, Justice.

Employers Reinsurance Corporation (ERC) appeals from a declaratory judgment holding ERC has a duty to indemnify and defend Holvik Halvorson Insurance, Inc. (HHII) in a South Dakota lawsuit brought by Edean Landmark and that ERC is liable for HHII's reasonable costs and attorney fees incurred for this declaratory judgment action. Bert Holvik cross-appeals from the judgment holding ERC has no duty to indemnify or defend him in his personal capacity against Landmark's lawsuit. HHII also cross-appeals from the judgment, asserting ERC is liable for HHII's costs and attorney fees on this appeal. We affirm, but remand for determination of HHII's reasonable costs and attorney fees incurred in this appeal.

Holvik is a Fargo insurance agent with a lengthy career in insurance sales. ERC became Holvik's errors and omissions insurance carrier on April 16, 1984, when Holvik owned a sole proprietorship known as Bert Holvik & Associates. During 1985, Holvik's principal insurance client and largest premium risk was Aerial Contractors, a business mainly owned by Jim Nesheim. Nesheim, who was Holvik's good friend, also was part owner of Chisioux, Inc., a general contractor for government construction projects. In April 1985, Nesheim asked Holvik to obtain South Dakota workers compensation insurance for Chisioux. St. Paul Fire & Marine Insurance Company (St. Paul) was the South Dakota assigned risk workers compensation carrier and the company also had a policy in force for Aerial Contractors.

On April 2, 1985, Holvik wrote to St. Paul requesting that Chisioux and three other Nesheim-owned companies be added to Aerial Contractors' South Dakota workers compensation insurance policy. On May 15, 1985, St. Paul sent Holvik a form to be completed before Chisioux could be added to the policy. For unknown reasons, Holvik never returned the form to St. Paul and Chisioux was not added as an insured on Aerial Contractors' South Dakota policy.

On October 22, 1985, Landmark, a Chisioux employee, fell from a ladder and was injured while working on a South Dakota project. Chisioux promptly notified Holvik of Landmark's claim and sent Holvik copies of bills relating to the claim and a doctor's preliminary report of injury. At first, Landmark's injury did not appear serious. Landmark was treated by a chiropractor whose preliminary report indicated Landmark could return to work in seven to ten days from his first visit. He estimated $800 would be the cost of Landmark's medical treatment.

After the Landmark claim was reported, Holvik discovered Chisioux had never been added to the South Dakota workers compensation policy and there was no coverage for Landmark's injury. Holvik, out of personal pride, did not tell Aerial Contractors, his largest client, that he had made an error in failing to procure South Dakota workers compensation coverage for Chisioux. Holvik also thought Landmark's claim would not reach the $2,500 deductible on his ERC errors and omissions policy. Holvik decided to personally pay Landmark's medical bills, and in 1985, he paid $427.

In late 1985, Holvik and David Halvorson, another insurance agent, decided to go into business together. They formed a corporation, HHII, which began business on January 1, 1986. At that time Holvik and Halvorson each owned one-half of the shares of the corporation. Both have been the only shareholders of the corporation, have held the position of president at various times during its existence, and have been officers and employees of the corporation since its inception. Halvorson is currently president and owns two-thirds of the stock. Holvik owns the other one-third. ERC, which had been Holvik's insurer, became HHII's errors and omissions insurance carrier on April 16, 1986, and has, through annual renewals, continued to provide that insurance for the corporation ever since. Holvik signed the application in 1986 as corporate president and also signed the renewals for 1987 and 1988. Halvorson signed the renewal applications for the corporation from 1989 through 1992. During this time, Holvik never told Halvorson that he was paying Landmark's medical bills.

Other than the initial $427, Holvik paid no further medical expenses for Landmark before April 16, 1986. Holvik knew there might be future chiropractic bills, but he continued to think Landmark's injury was a minor one. By the end of 1986, however, Holvik had paid from his personal funds between $15,000 and $20,000 directly to, or on behalf of, Landmark on his claim. From 1986 until 1992, Holvik personally made more than $50,000 in additional payments for medical expenses and wage loss benefits on Landmark's behalf.

By April 1992, Holvik was contemplating retirement. Because he was still paying Landmark, Holvik realized something had to be done about the matter. On April 9, 1992, Holvik told Landmark for the first time that he had been personally paying for his workers compensation claim through the years and that the payments were not being made by the insurance company as Holvik had led him to believe. On the same day, Holvik notified ERC about Landmark's claim. He later notified Chisioux that he had failed to obtain South Dakota workers compensation coverage for it in 1985. However, Holvik did not tell anyone at HHII about the existence of the Landmark claim until June 1992, when Halvorson confronted Holvik after receiving a letter about the claim from ERC.

In June 1992, Landmark filed an action in South Dakota against Holvik, Halvorson, HHII, Aerial Contractors, Chisioux, and its owner, seeking, among other things, workers compensation benefits, damages for fraud, and exemplary damages. The defendants tendered the defense over to ERC, the errors and omissions insurer. ERC then brought this declaratory judgment action under N.D.C.C. Chapter 32–23 to determine whether any of its policies issued to Holvik or HHII provided either liability coverage or a duty to defend Holvik and HHII.

Following a trial, the court held ERC had no obligation to indemnify or defend Holvik or his defunct sole proprietorship for claims made against them in Landmark's lawsuit or to reimburse Holvik for payments he made to, or on behalf of, Landmark for his injury. The trial court further held, however, that ERC had a duty to indemnify and defend

HHII on Landmark's claims in the South Dakota lawsuit and that ERC was obligated to reimburse HHII for its reasonable costs and attorney fees incurred in the declaratory judgment action. These appeals followed.

## I

Holvik asserts the trial court erred in concluding ERC had no duty to indemnify and defend him against Landmark's claims. The trial court reasoned the ERC errors and omissions policy was a "claims made" policy, and because Holvik failed to comply with the policy's notice provisions, ERC had no duty to defend Holvik in the South Dakota action, no duty to reimburse him for payments he made to Landmark, and no obligation to pay his attorney fees for the declaratory judgment action.

## A

■■ There are two major types of liability insurance: (1) an "occurrence" policy provides coverage if the event insured against takes place within the policy period, regardless of when the injured party makes a claim; and (2) a "claims made" policy provides coverage only if a claim arising from the hazard insured against is made by the injured party during the policy period, thus making the injured party's presentation of the claim the most significant factor in the triggering of coverage. *See Kief Farmers Co-op. Elevator v. Farmland,* 534 N.W.2d 28, 36 (N.D.1995). A variation of the "claims made" policy is a "claims made and reported" policy. While a " 'claims made' policy implicitly allows reporting of the claim to the insurer after the policy period, as long as it is within a reasonable time, ... a 'claims made and reported' policy imposes the additional condition that the insured report the claim to the insurer within the policy period, or within a specified time after learning of the claim...." 2 R. Long, *The Law of Liability Insurance* § 12A.05[3A], at p. 12A–68.1 (1996).

■■ The notice provisions of the ERC policy appear in sections I, V(c) and X(b). Section I provides:

"COVERAGE. The Corporation does hereby agree to pay on behalf of the Insured such loss in excess of the applicable de-

ductible stated and within the limit of liability specified in the Declarations sustained by the Insured by reason of liability imposed by law for damages caused by any negligent act, error or omission of the Insured or any person for whose acts the Insured is legally liable, arising out of the conduct of the business of the Insured in rendering services for others as a general insurance agent, insurance agent or insurance broker, and including activities as an insurance consultant or notary public, *as respects claims first made against the Insured during the policy period.*"

(Emphasis added). Section V(c) defines the term "claims first made" to

"mean that the Insured has received notice of legal process, that a demand for money or services has been made against the Insured, or that *the Insured has become aware of a proceeding, event or development which has resulted in or could in the future result in the institution of a claim against the Insured.* In the event of any such proceeding, event or development, *notice must be given to the Corporation during the policy period;* "

(Emphasis added). Section X(b) further provides:

"NOTICE. The Insured shall give prompt notice to the Corporation of:"

\* \* \* \* \*

"(b) any proceeding, event, or development which *in the judgment of the Insured* might result in a claim against the Insured;"

(Emphasis added).

Holvik asserts the notice provisions are ambiguous because section V(c) does not contain the modifying language, "in the judgment of the Insured," contained in Section X(b). According to Holvik, notwithstanding the section V(c) requirement that notice be given during the policy period, a reasonable insured could interpret section X(b) as meaning he could make a "judgment" call and report only those events he believed might lead to a claim. Holvik therefore contends the ERC policy is actually an "occurrence" policy, and because it was reasonable for him

to believe Landmark's injury was minor and would not amount to any significant payments, the policy should be interpreted to provide coverage.

In *Farmland,* 534 N.W.2d at 32, we summarized the relevant rules for interpreting an insurance policy:

"Interpretation of an insurance policy is a question of law, fully reviewable on appeal. *Hart Const. Co. v. American Fam. Mut. Ins.,* 514 N.W.2d 384 (N.D.1994). Applying contract construction principles, we attempt to give effect to the mutual intention of the parties at the time of contracting by ascertaining that intent through the language of the contract itself, giving effect to all of its provisions if possible. *Continental Cas. Co. v. Kinsey,* 499 N.W.2d 574 (N.D.1993). Unambiguous language will be given its clear meaning. *State Farm v. LaRoque,* 486 N.W.2d 235 (N.D.1992). Ambiguity in contract language exists when the language can be reasonably construed as having at least two alternative meanings, and whether the contract is clear and unambiguous is a question of law for the court to decide. *State Farm Fire and Cas. Co. v. Sigman,* 508 N.W.2d 323 (N.D.1993). We consider whether a person not trained in the law or in the insurance business can clearly understand the language. *Aid Ins. Services, Inc. v. Geiger,* 294 N.W.2d 411 (N.D.1980). Because insurance policies are adhesion contracts, in applying the rules to resolve ambiguities, we balance the equities in favor of providing coverage to the insured. *Northwest G.F. Mut. Ins. Co. v. Norgard,* 518 N.W.2d 179 (N.D.1994)."

The trial court rejected Holvik's characterization of the ERC policy as an "occurrence" policy. The court instead interpreted the policy as a "claims made" policy, and concluded "if a claim is made against the insured and promptly reported, that claim is covered even though the policy period may have ended prior to the company's receiving notice of the claim." The court held, however, that Holvik did not give prompt notice of the claim.

We agree with the trial court that this policy cannot be construed as an "occur-

rence" policy. All of the provisions of an insurance policy must be given effect if possible. *Farmland,* 534 N.W.2d at 32. Construing the ERC policy as an "occurrence" policy would render the notice provisions meaningless. We need not determine whether this policy is a "claims made and reported" policy, rather than a "claims made" policy, as determined by the trial court. *See, e.g., Pacific Employers Ins. v. Superior Court,* 221 Cal. App.3d 1348, 270 Cal.Rptr. 779 (1990); *Jefferson Guar. v. Westbank–Marrero Cab,* 570 So.2d 498 (La.Ct.App.1990). In either case, we agree with the trial court there was no timely notice.

The trial court found Holvik is "well versed" in insurance products and understands the difference between "claims made" and "occurrence" policies. Holvik first became aware of Landmark's injury in October 1985. Although Holvik was aware of only $427 in payments and thought Landmark's injury was minor before renewing the ERC policy in 1986, by the end of 1986, Holvik had paid more than $15,000 to, or on behalf of, Landmark for his injury. The trial court therefore found that by the end of 1986, "Holvik was well aware that the Landmark matter was a claim against him." Holvik did not give notice to ERC until April 1992, about six years after he was aware of the severity of Landmark's injury. The trial court reasoned Holvik, under the circumstances, did not give ERC prompt notice to trigger coverage under the policy.

 A trial court's findings of fact are clearly erroneous under N.D.R.Civ.P. 52(a) when, although there is some evidence to support them, the reviewing court on the entire evidence is left with a definite and firm conviction a mistake has been made. *Peterson v. Front Page,* 462 N.W.2d 157, 159 (N.D.1990). The trial court's finding the notice was untimely is not clearly erroneous.

Relying on the dissenting opinion in *Slater v. Lawyers' Mutual Ins. Co.,* 227 Cal.App.3d 1415, 278 Cal.Rptr. 479 (1991) (Johnson, J., dissenting), Holvik alternatively contends we should apply the notice-prejudice rule to "claims made" policies and hold that, even if he breached the notice provisions, he can still

recover under the policy unless ERC demonstrates it was prejudiced by Holvik's actions. *Compare Finstad v. Steiger Tractor, Inc.*, 301 N.W.2d 392, 397–398 (N.D.1981) (applying notice-prejudice rule to group accident indemnity "occurrence" type insurance policy); *Esmailzadeh v. Johnson and Speakman*, 869 F.2d 422, 424 (8th Cir.1989) (distinguishing between "occurrence" and "claims made" policies and refusing to apply notice-prejudice rule to "claims made" policy). The trial court concluded ERC was not required to prove prejudice to deny coverage for the late claim, but also concluded prejudice to ERC was amply shown as a result of Holvik's six-year delay in reporting the Landmark claim. We need not decide whether the notice-prejudice rule should be applied to "claims made" policies because, even if it should, the trial court's finding of prejudice is supported by the record.

The trial court found ERC had been prejudiced in several ways by the long delay. All principals of Chisioux had died. Meaningful investigation of Landmark's workers compensation claim more than six years after the accident had become impossible, according to an ERC representative. Some of the co-employees who may have witnessed Landmark's accident could not be located. The trial court noted investigation of some subrogation possibilities for ERC against other contractors at the job site had also been impaired by the lapse of time. Since the October 1985 injury, there has been no medical management of Landmark's treatments, making it difficult to assess whether his present injuries are related to the accident. The trial court reasoned that demands for coverage under the St. Paul policy, which should have covered Chisioux, were delayed several years and would have been better pursued while memories were fresh and the principals of Chisioux were alive. The trial court noted that, because of Holvik's actions, there is now a claim for penalties under S.D. Codified Laws Ann. § 62–3–11 in the South Dakota action which could have been avoided had the claim been promptly reported to ERC. We conclude there is a sufficient showing ERC was prejudiced by Holvik's late reporting of the claim.

We conclude the trial court correctly ruled ERC is not liable under its policy to cover Landmark's claim against Holvik in his personal capacity.

### B

Holvik asserts even if ERC has no duty to provide coverage, ERC nevertheless has a duty to defend him in the South Dakota action. He erroneously relies upon *National Farmers v. Kovash*, 452 N.W.2d 307 (N.D. 1990), where we concluded there was no duty to defend because the complaint alleged facts which did not give rise to potential liability or a possibility of coverage.

 A liability insurer's duty to defend its insured exists only if it would be held bound to indemnify the insured in case the injured person prevailed upon the allegations of the complaint. *Kyllo v. Northland Chemical Co.*, 209 N.W.2d 629, 634 (N.D.1973). However, a duty to defend arises only if the conditions precedent to the policy, such as proper notice, are met. *Hague v. Liberty Mut. Ins. Co.*, 571 F.2d 262, 267 (5th Cir. 1978). Lack of notice is an affirmative defense of the insurer to both the duty to defend and the duty to indemnify. *Jostens, Inc. v. CNA Ins./Continental Cas.*, 403 N.W.2d 625, 629 (Minn.1987), *overruled on other grounds*, *NSP v. Fidelity & Cas. Co. of New York*, 523 N.W.2d 657, 664 (Minn.1994). Because Holvik clearly violated the notice provisions of the policy, ERC neither has a duty to provide coverage for Holvik against Landmark's claims nor has a duty to defend Holvik in that action.

### C

Holvik asserts ERC should be estopped from denying coverage for several reasons.

 Holvik first relies on *Kenefick v. Hitchcock*, 187 Wis.2d 218, 522 N.W.2d 261 (Ct.App.1994), for the proposition that ERC has forfeited all defenses it had against the duty of coverage and the duty to defend because ERC did not obtain a stay of the proceedings in the South Dakota lawsuit when it began this declaratory judgment action for a determination of its liability to defend and extend policy benefits. In *Kene-*

*fick,* 522 N.W.2d at 266–267, the Wisconsin appeals court, after discussing Wisconsin caselaw, said:

> "The rule has thus developed that an insurer who has a duty to defend under the broadly drawn rules just discussed, and who claims that the terms of the policy deny coverage for the incident forming the basis of the suit, must take steps to seek and obtain a bifurcated trial—litigating coverage first and obtaining a stay of all proceedings in the liability and damage aspects of the case until coverage, or lack of coverage, is determined."

We have not applied this rule as a matter of North Dakota law. While the *Kenefick* court's ruling may have some appeal under proper circumstances, we decline to apply it here. ERC promptly brought the declaratory judgment action after becoming aware of Landmark's claim. The underlying lawsuit is in another jurisdiction, over which this court would have no control on the issue of a stay. Holvik's six-year delay in reporting the Landmark claim was not reasonable. Moreover, the rule applied in Wisconsin is not ironclad. The *Kenefick* court refused to order the insurer liable for all damages in the underlying lawsuit. It ruled the insured could seek reimbursement from the insurer of the expenses incurred in defending the liability and damage portions of the underlying case prior to the time it was determined there was no coverage under the policies, a remedy not sought by Holvik. We conclude ERC's failure to obtain a stay in the South Dakota action while this declaratory judgment action was pending did not result in a forfeiture of its defenses under the policy.

■ Holvik also asserts ERC should be estopped from denying him a defense because the attorney it hired to defend HHII in the South Dakota action, other than depose Holvik, "has done nothing whatever in the South Dakota case to assist in establishing liability on the part of St. Paul." According to Holvik, the South Dakota attorney's alleged inaction constitutes a breach of its duty to defend HHII, of which he owns one-third of the stock, and somehow estops ERC from denying its duty to defend him personally. We conclude Holvik's allegation falls far

short of establishing that ERC is not conducting a good faith defense in the South Dakota action and does not provide him a ground for estoppel against ERC.

Holvik asserts ERC is estopped from providing a defense for him because ERC representatives told him to make an additional $1,156 payment to Landmark after Holvik informed ERC about the Landmark matter. An ERC representative testified neither she nor any other ERC representative encouraged Holvik to make the payment. The trial court found, "no one at ERC or anyone acting on its behalf directed Holvik to make any additional payments to Landmark." Holvik contends the trial court erred in making this finding because it excluded from evidence two exhibits, handwritten by Holvik, recording the representatives' suggestions soon after the conversations took place. Holvik asserts these exhibits were admissible under N.D.R.Ev. 801(d)(1)(ii), and if the trial court had considered them it "may well have found that the doctrines of waiver and estoppel applied, ..."

■ Error, if any, in not admitting the exhibits was harmless in this case. *See* N.D.R.Ev. 103(a). The trial court allowed Holvik to testify the exhibits described conversations he had with the ERC representatives. Holvik also testified at length about those conversations. Holvik has not shown what more the trial court would have been apprised of had he admitted the exhibits. We conclude the trial court's finding ERC representatives did not encourage Holvik to make the last Landmark payment is not clearly erroneous.

The trial court did not err in concluding ERC has no duty to indemnify or defend Holvik in Landmark's South Dakota lawsuit.

II

ERC asserts the trial court erred in holding it has a duty to indemnify and defend HHII in Landmark's South Dakota lawsuit.

In deciding this issue, the trial court made extensive findings about Holvik's efforts to conceal the Landmark matter from HHII. The trial court found Holvik kept all Landmark documents separate from other agency

papers and locked them in his personal office credenza where no one else had access. Holvik paid Landmark from his personal funds, usually through cashier's checks Holvik bought at various banks. So no one in the insurance agency would be aware of the Landmark matter, Holvik gave Landmark a different post office box number to contact him, which was a personal box Holvik had rented. Holvik changed the agency address on written correspondence to his personal post office box. Holvik also typed his own letters to Landmark so the agency secretarial staff would not be involved. All calls from Landmark were taken privately by Holvik. Holvik never mentioned Landmark during monthly work meetings held to discuss problem situations. Holvik often told Landmark the insurance company was making the payments. Even after reporting the claim to ERC in April 1992, Holvik told an ERC representative, its attorney, and an insurance adjustor, not to tell anyone at HHII about the Landmark matter.

HHII relied on a fidelity coverage endorsement to the ERC errors and omissions policy which was in effect from April 16, 1986, through the date of trial, in arguing the ERC policy provides coverage.

> "IT IS AGREED that this policy is extended to cover dishonest, fraudulent, criminal or malicious acts committed by an employee of the Named Insured, and paragraph (a) of the section of this policy captioned 'Exclusions', is hereby amended accordingly. The coverage provided by this Endorsement shall extend to the Named Insured and any Insured, provided that such Insured did not personally participate in or ratify the dishonest, fraudulent or criminal act."

The trial court found that Holvik was an "employee" within the meaning of the provision, that "the corporation had no knowledge of Holvik's actions and that Holvik was never acting within the scope of his employment when he concealed and misrepresented the Landmark matter." The trial court reasoned, because the fidelity endorsement was intended to protect "innocent" insureds, because Holvik "actively concealed" the Landmark claim from HHII for more than six years, and because HHII never ratified Holvik's actions, ERC had an obligation to indemnify and defend HHII in Landmark's South Dakota lawsuit.

A

ERC asserts the policy does not provide coverage because HHII is not an "innocent" insured. ERC's primary argument is that regardless of Holvik's efforts to conceal the Landmark matter from others at HHII, Holvik was an agent, officer and shareholder of the corporation and his knowledge of the Landmark claim must be imputed to HHII. ERC argues the corporation's claim of coverage must therefore fail for the same reasons Holvik's claim of coverage in a personal capacity failed. Imputing Holvik's knowledge to HHII is particularly justified here, according to ERC, because Holvik, when signing annual renewal applications on behalf of the corporation, made misrepresentations by specifically denying there existed any circumstances which might result in any errors or omissions claims being made against the applicant, its predecessor in business, or any past or present partners, executive officers, or directors.

■ Generally, the knowledge of the board of directors, officers, or agents of a corporation is imputed to the corporation. *E.g., Bourgois v. Montana–Dakota Utilities Co.,* 466 N.W.2d 813, 817 (N.D.1991); *Federal Sav. and Loan Ins. Corp. v. Morque,* 372 N.W.2d 872, 876 (N.D.1985); N.D.C.C. § 3–03–05, 3 *Fletcher Cyclopedia of the Law of Private Corporations* § 790 (1994); 18B Am. Jur.2d *Corporations* § 1671 (1985). However, the rule of imputed knowledge is not absolute; there are various qualifications and exceptions. *E.g.,* 3 *Fletcher,* at § 819 *et seq.;* 18B Am.Jur.2d *Corporations,* at § 1675 *et seq.* None of the cases cited by ERC in support of its imputed knowledge argument involved fidelity insurance coverage disputes. In that area of the law, specific qualifications and exceptions also apply.

■ Whether an individual who is an officer, director, or shareholder of the insured corporation constitutes an "employee" within the meaning of fidelity bonds or insurance

policies, thereby affording the corporation fidelity coverage, largely depends on the facts and circumstances of a particular case. *See* Annot., *Obligee's Concealment or Misrepresentation Concerning Previous Defalcation as Affecting Liability on Fidelity Bond or Contract,* 4 A.L.R.3d 1197, at §§ 3 and 7 (1965). Courts have reached various results, which are often difficult to reconcile. *See* 4 A.L.R.3d, at p. 1200 (1963). But if caselaw contains any semblance of uniformity in treating an employee as the alter ego of the insured corporation and denying fidelity coverage, it occurs when the dishonesty which causes the loss is that of a person who is the only officer, director, and shareholder of the insured corporation.

For example, in *McKee v. Great American Insurance Company,* 316 F.2d 473 (5th Cir.), *cert. denied,* 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 62 (1963), a fidelity bond was issued to the principal officer and sole stockholder of two corporations that had gone bankrupt. The receiver sued on the bond to collect the losses sustained by the companies as a result of the fraudulent actions of the sole stockholder. The court affirmed summary judgment dismissal, concluding "the bonds did not cover the defalcations of ... the principal officer and sole stockholder of the corporations." *McKee,* 316 F.2d at 474. To the same effect is *Kerr v. Aetna Casualty & Surety Co.,* 350 F.2d 146 (4th Cir.1965), in which a named insured under a fidelity bond was a corporation whose principal officers and only directors were two individuals who directly owned 75 percent of the stock, the remainder of which was held by a private corporation which they also owned. The corporation wrote off loans it had made to the two of them for personal purposes. The court refused to consider the two individuals "employees" and held the fidelity bond did not cover the corporation's losses attributable to them. In *Employer's Admin. Servs., Inc. v. Hartford Accident & Indem. Co.,* 147 Ariz. 202, 709 P.2d 559 (Ct.App.1985), the named insured was a corporation wholly owned by two persons who were also its sole officers and directors. The court affirmed summary judgment denying the corporation fidelity insurance coverage for losses incurred by the two shareholders who together misappropriated money from the accounts of the corporation's clients. *See also Bird v. Centennial Ins. Co.,* 11 F.3d 228, 232–233 (1st Cir.1993); *Three Garden Village Ltd. Partnership v. United States Fidelity & Guar. Co.,* 318 Md. 98, 567 A.2d 85, 90–93 (1989).

Under circumstances where the dishonest "employee" does not have sole and total control of the corporation, courts do not uniformly apply the alter ego doctrine to deny fidelity coverage. However, most courts deny coverage when the dishonest employee or employees essentially own and control the corporation. Denying fidelity coverage for fraudulent and dishonest acts of a shareholder who, with his former wife, owned 95 percent of the corporation's common stock and completely dominated the corporation, the court in *Matter of World Hospitality Ltd.,* 983 F.2d 650, 652 (5th Cir.1993), said:

> "[T]here is a strong policy reason for denying the corporation coverage under the bonds in question. A corporation can only act through its officers and directors. When one person owns a controlling interest in the corporation and dominates the corporation's actions, his acts are the corporation's acts. Allowing the corporation to recover for the owner's fraudulent or dishonest conduct would essentially allow the corporation to recover for its own fraudulent or dishonest acts. The bonds, however, were clearly designed to insure the corporations against their employee's dishonest acts and not their own dishonest acts."

*See also Red Lake County State Bank v. Emp. Ins. of Wausau,* 874 F.2d 546 (8th Cir.1989) (fidelity bond would not provide coverage for losses caused by dishonest corporate employee who was 92 percent shareholder, president, chief operating officer, director, and effective owner of bank); *Farmers' & Merchants' State Bank v. United States Fidelity & Guar. Co.,* 28 S.D. 315, 133 N.W. 247, 249 (1911) (where fidelity bond issued to bank covered particular employee who during policy period purchased majority of bank's stock and embezzled funds, insurer not liable because "[w]hen the person whose conduct is in-

sured ceases to be an employe[e], within any fair and reasonable interpretation of the term as used in the policy, the insurer's liability should cease, unless he has notice of the change.").

There is an early North Dakota decision that addresses the topic. In *McIntosh v. Dakota Trust Co.*, 52 N.D. 752, 204 N.W. 818 (1925), the court held a surety on the fidelity bond of a cashier of a bank was released from liability where the president of the bank, when applying for the bond, concealed and misrepresented the prior embezzlements of the cashier. The case involved three bank officers, *i.e.*, the cashier, the president, and the vice president, who constituted the entire board of directors and management of the bank and also owned 80 percent of its stock. Because the three together embezzled the bank's funds, the bank went into receivership, and the receiver sought to recover on the fidelity bond.

The receiver argued whatever knowledge the directors had about the embezzlements, when they fraudulently obtained the bond, could not be imputed to the corporation because it was a legal entity distinct from its officers and directors. He argued the corporation was therefore without knowledge of the material facts and could not be charged with concealing or misrepresenting them. The receiver relied on the well-recognized exception to the general rule that a principal is chargeable with the knowledge of its agents, which

> " 'does not arise where the agent acts or makes declarations not in execution of any duty that he owes to the principal, nor within any authority possessed by him, but to subserve simply his own personal ends or to commit some fraud against the principal. In such cases the principal is not bound by the acts or declarations of the agent unless it be proved that he had at the time actual notice of them, or, having received notice of them, failed to disavow what was assumed to be said and done in his behalf.' "

*McIntosh*, 204 N.W. at 825 (quoting *American Surety Co. v. Pauly*, 170 U.S. 133, 156–157, 18 S.Ct. 552, 561, 42 L.Ed. 977 (1898)).

The court rejected the receiver's argument, reasoning:

> "The fallacies of the receiver's position as to imputed knowledge are so obvious as almost to elude analysis and concise statement. In the first place, the receiver lays hold on a legal fiction, invented to serve the ends of justice, and seeks to make of it a means for the perpetration of fraud upon persons who have, in good faith, dealt with or who supposed, at least, that they were dealing with, the corporation through the agency of its duly constituted board of directors—in this instance also comprising all the persons in active charge of its business—in relation to a subject-matter within the lawful scope of their and its authority."

*McIntosh*, 204 N.W. at 825.

The court's analysis, at first glance, supports ERC's position. Read literally, this analysis would release any insurance company from its obligations on a fidelity bond covering any agent because the court imputes to the principal the knowledge of the agent's misdeeds. We decline, however, to interpret *McIntosh* that expansively. The court was faced with a situation where the three conspiring officers were also the bank's board of directors and the owners of 80 percent of the bank's stock. *McIntosh* might well have been decided differently if only one of the directors and shareholders had been involved in the embezzling and had made the misrepresentations on the application for the bond. We view *McIntosh* as being consistent with cases from other jurisdictions holding fidelity coverage does not exist when the defalcating employees' amount of control over and ownership of the corporate entity is overwhelming.

Many courts have refused to apply the alter ego theory to deny fidelity coverage when control and ownership is not so overwhelming. *See, e.g., Federal Deposit Ins. Corp. v. National Sur.*, 281 N.W.2d 816, 820–821 (Iowa 1979); *Transamerica Ins. Co. v. F.D.I.C.*, 489 N.W.2d 224, 228–229 (Minn. 1992); *Seattle Intern. v. Commerce & Ind. Ins. Co.*, 24 Wash.App. 108, 600 P.2d 612, 613–614 (1979). For example, in *Charm Promotions, Ltd. v. Travelers Indem. Co.*, 447

F.2d 607 (7th Cir.1971), the named insured was equally owned by two corporations which were respectively owned by two different groups of persons in different cities, each of which could elect one-half of the board of directors. The dishonest acts were committed by persons active in the business who were members of only one of the two groups. The court reversed summary judgment for the surety, concluding the surety could be liable on the bond because the case "does not involve a situation where the officer involved is the sole or majority shareholder of the insured...." *Charm Promotions, Ltd.*, 447 F.2d at 612. So too, in *General Finance Corp. v. Fidelity & Cas. Co. of New York*, 439 F.2d 981 (8th Cir.1971), the court held the fidelity bond applied to the loss caused by the insured corporations' president who, with his wife, owned a majority of the stock, because there were boards of directors on which the president had only one vote. The court noted the directors "at all times had the right to govern and direct the exercise of all corporate powers," even though the boards had operated as a " 'rubber stamp.' " *General Fin. Corp.*, 439 F.2d at 984.

The theory behind refusing to blindly apply the alter ego theory in all situations is explained in *Federal Deposit Insurance Corporation v. Lott*, 460 F.2d 82 (5th Cir.1972), where the president and majority stockholder of a bank committed fraudulent acts which caused losses to the bank, but which he kept secret from other members of the bank's board of directors. In response to the argument the dishonest majority shareholder should not be allowed to insure himself and profit from his own fraudulent actions, the court said:

"Lott was not the bank's sole shareholder and the district court's judgment specifically excludes Lott from participating in any recovery. Innocent shareholders and creditors should not have to bear a loss when the fraudulent majority shareholder will not benefit from his fraud. Moreover, the facts here do not show that Lott was in sole control of the bank.

\* \* \* \* \*

"Generally, an officer's or director's knowledge acquired while acting within the scope of his duties will be imputed to the bank.... However, where, as here, Lott fraudulently dealt with the bank in his own interest, he is deemed to have an adverse interest and the knowledge possessed by him in the transaction is not imputable to the bank."

*Lott*, 460 F.2d at 87–88 (footnotes and citations omitted). In *Lott*, 460 F.2d at 87 n. 5, the trial court had ordered that if the Federal Deposit Insurance Corporation (FDIC), after final accounting of all its losses and recoveries in connection with the failed bank, determined there were funds due and owing to the bank's stockholders, FDIC must return to the fidelity insurer those funds which would be due to Lott as a stockholder.

This court reached a similar result in *Continental Cas. Co. v. Kinsey*, 499 N.W.2d 574 (N.D.1993). *Kinsey* was a declaratory judgment action brought by an insurance company to determine the extent of its coverage under a professional liability policy. The insurance company expressly promised to pay for punitive damages awarded against the insured, contrary to this state's public policy, expressed in N.D.C.C. §§ 9–08–02 and 26.1–32–04, to exempt insurance carriers from liability for punitive damages or any other losses incurred by an insured because of the insured's intentionally wrongful conduct. To give effect to both the legislative mandate and the insurer's express contractual promise, we held the insurer was obligated to pay the victim punitive damages up to the policy limits, but the insurer had recourse against the insured and could seek indemnity from him for the payments made. *Kinsey*, 499 N.W.2d at 580–581. The *Kinsey* rationale is applicable here to preclude a misrepresenting shareholder from profiting from his own wrongdoing.

The circumstances in this case are also similar to those in *Nat. Union Fire Ins. v. Lomax Johnson Ins.*, 496 So.2d 737 (Ala. 1986), where the vice president of an insurance agency failed to obtain workers compensation coverage for a client whose employees were later injured. The vice president paid the employees' claims from his own funds as long as he could, and actively concealed from

the agency his failure to obtain workers compensation coverage. The agency informed the insurer a few days after being informed of the problem. The insurer argued the agency should be deemed to have obtained notice of a potential claim against it at the same time its vice president did, thereby precluding coverage because of violation of a notice provision. After recognizing whether notice to an agent constitutes notice to the principal depends upon the relationship of the parties and an agent's duty to make disclosures to the principal "is not a hard and fast rule," the court reasoned:

"We find no justification for applying the rule of constructive notice in the manner National Union would have us apply it. The very nature of the acts to which the errors or omissions policy is directed is such that it may be expected that one who has committed such acts will seek to avoid, rather than advance, the discovery of the error by others. That is exactly what Dunaway did. It is not reasonable to expect the unexpected and it is not reasonable to hold a party to a course of conduct where such conduct is not to be expected."

*Lomax Johnson Ins.*, 496 So.2d at 739. *See also American Financial Corp. v. Fireman's Fund Ins. Co.*, 15 Ohio St.2d 171, 239 N.E.2d 33, 36 (1968) ("Where the purpose of a policy of insurance is to protect an employer from losses caused by an error or omission in the performance of his duty by an employee, the doctrine of imputed knowledge will not operate to defeat recovery by the employer under the policy where there is an exclusion from liability clause based on notice to the employer and only the employee at fault has actual knowledge as to his own error or omission.")

■ Holvik's control over and ownership of HHII was not so substantial as to require imputation. We conclude the trial court did not err in refusing as a matter of law to impute Holvik's knowledge of the Landmark claim to HHII.

### B

■ In many of the cases previously discussed, the courts focused on the definitions of the term "employee" in arriving at their rulings that a corporate officer and shareholder either was or was not an "employee" for purposes of fidelity coverage. In the present case, the term "employee" is not defined in the policy. ERC argued the term "employee" in the fidelity endorsement was intended to exclude officers or other high level employees of the corporation from the scope of the endorsement. The trial court rejected this argument, and so do we.

■ A term in an insurance policy is given its ordinary meaning, rather than a restrictive one, when the insurer fails to define the term. *Thedin v. U.S. Fidelity & Guar. Ins. Co.*, 518 N.W.2d 703, 706 (N.D. 1994). An employee has been defined as "one employed by another...." Webster's Third New International Dictionary at p. 743 (1971). Here, Holvik was employed by HHII. The trial court correctly found that Holvik was an "employee" within the meaning of the fidelity endorsement.

■ ERC also asserts the trial court's finding Holvik was not acting within the scope of his employment with HHII when he concealed and misrepresented the Landmark matter is clearly erroneous. We disagree.

There was evidence presented that any errors or omissions in relation to Holvik's attempt to obtain workers compensation coverage for Chisioux occurred before HHII was formed. After HHII was formed, Holvik continued to treat the Landmark matter as his personal responsibility. There is no evidence suggesting Holvik was acting for the benefit of HHII, or that HHII received any benefit from the Landmark matter. The trial court's finding is not clearly erroneous.

We conclude the trial court's findings that Holvik actively concealed the Landmark matter from HHII, that Holvik was not acting within the scope of his employment when he concealed and misrepresented the Landmark matter, and that HHII never ratified Holvik's actions are not clearly erroneous. The trial court did not err in refusing to impute Holvik's knowledge to HHII.

### C

ERC asserts Holvik's written misrepresentations in the annual renewal applications

voids the ERC policy under N.D.C.C. 26.1–29–25, which provides:

> "*Misrepresentations—Determination of materiality—Effect.* An oral or written misrepresentation made in the negotiation of an insurance contract or policy by the insured or in the insured's behalf is material or defeats or avoids the policy or prevents its attaching only if the misrepresentation has been made with actual intent to deceive or unless the matter misrepresented increased the risk of loss."

Under this statute, either a misrepresentation made with intent to deceive or a misrepresentation material to the risk of loss, without an intent to deceive, is a ground to avoid an insurance policy. *Lindlauf v. Northern Founders Insurance Company*, 130 N.W.2d 86, 89 (N.D.1964) (construing predecessor statute). Notwithstanding ERC's repeated allegations that Holvik's conduct was fraudulent, the trial court made no finding that Holvik, in making the misrepresentations, intended to deceive ERC. *See Industrial Com'n v. McKenzie County Nat. Bank*, 518 N.W.2d 174, 178 (N.D.1994). We refuse to make the factual finding sought by ERC. The trial court's refusal to find an intent to deceive is supported by evidence suggesting Holvik considered the Landmark matter a personal one which would never involve the corporate entity, HHII.

Moreover, the trial court rejected ERC's argument that Holvik's misrepresentations actually increased the risk of loss because ERC continued through the date of trial to renew its insurance coverage for HHII even after it became aware of the Landmark claim. The trial court did not err in considering ERC's own assessment of any additional risk caused by Holvik's misrepresentations and in concluding there was none.

We conclude the trial court properly determined ERC has a duty to defend and indemnify HHII in Landmark's South Dakota lawsuit.

### III

HHII asserts it is entitled to its attorney fees on appeal under a provision of the ERC policy entitled "DEFENSE EX-PENSES AND SUPPLEMENTARY PAYMENTS," which says ERC will pay "all reasonable expenses incurred by the Insured at [ERC's] request in assisting [ERC] in the investigation and defense of any claim or suit, ..." The trial court, based on this language, awarded HHII its attorney fees in the declaratory judgment proceedings below, and ERC on appeal has not challenged the court's interpretation of this policy language as allowing an award of attorney fees.

We have construed similar policy language as providing coverage for the insured's attorney fees expended in defending a declaratory judgment to determine coverage at the trial court level, *see State Farm Fire and Cas. Co. v. Sigman*, 508 N.W.2d 323, 326 (N.D.1993), and as also providing coverage for attorney fees expended in an appeal where we affirmed a declaratory judgment against the insurer. *See Johnson v. Center Mut. Ins. Co.*, 529 N.W.2d 568, 572 (N.D.1995). As in *Johnson*, we remand to the trial court for an award to HHII of its reasonable costs and attorney fees for defending this appeal.

Our resolution of the dispositive issues makes it unnecessary to address the other issues raised by the parties. *Kinsey*, 499 N.W.2d at 582. We affirm the declaratory judgment, but remand for a determination of HHII's reasonable costs and attorney fees for this appeal.

SANDSTROM and MESCHKE, JJ., concur.

The Honorable MARY MUEHLEN MARING was not a member of the Court when this case was heard and did not participate in this decision.

VANDE WALLE, Chief Justice, concurring in part and dissenting in part.

I join in the majority's Part I analysis and conclusion that Employers Reinsurance Corporation (ERC) has no obligation to indemnify or defend Bert Holvik or his defunct sole proprietorship in Edean Landmark's lawsuit.

I dissent to Part II, wherein the majority concludes that ERC has an obligation to indemnify and defend Holvik Halvorson Insurance, Inc., (HHI). Where, as here, the

one who is deceitful holds a substantial ownership, 50%, of the corporation, the imputation of Holvik's knowledge to the corporation is required as a matter of public policy. To do less is to encourage the dishonest owner to launder ownership in order that his or her deceit will be excused because of the innocent good-faith purchaser. The courts should provide no vehicle to accomplish that purpose to the benefit of the wrong doer. This is, after all, not a transaction in negotiable instruments which, because of commercial expediency, excludes the "good faith" holder from certain defenses. *See, e.g.,* NDCC § 41–03–31. When the operator and holder of 50% of the stock in the corporation has knowledge, it should be imputed to the corporation. When or how else will a corporation ever be charged with knowledge?

The misrepresenting shareholder is not the only focus. Halvorson chose Holvik as his associate. The insurance company relied on the statements of the former sole owner and still 50% owner of the business. As between ERC and Holvik there is no question that the law and the equities favor ERC. To require ERC to defend and indemnify HHI has little basis in law and is unsound on equitable principles as well. The effect is to keep whole HHI, of which Holvik owns 50%, because of Halverson's 50% ownership.

The majority says ERC can seek indemnity from Holvik. That right to seek indemnity is viable only if Holvik and, in the future, others like him have the resources to indemnify. The court-concocted scheme to require ERC to defend and indemnify and then to seek indemnification from Holvik is founded in this Court's majority opinion in *Continental Cas. Co. v. Kinsey,* 499 N.W.2d 574 (N.D. 1993). That decision involved a liability insurer's obligation to an injured third party, an ambiguity in the insurance policy and public policy. Those elements are not present here. If *Kinsey* was good law in those circumstances, I would not apply it here.

The majority also concludes that Holvik is an "employee" within the meaning of the policy. This construction is contrary to *McIntosh v. Dakota Trust Co.,* 52 N.D. 752, 204 N.W. 818 (1925) notwithstanding the majority's attempt to finesse that decision by speculating the decision "might well have been decided differently if only one of the

directors and shareholders had been involved in the embezzling and had made the misrepresentations on the application for the bond."

In *McIntosh,* the directors owned 80% of the stock; 20% was held by persons not involved in the deceit. Here Holvik owned 50% and participated in running the business. Now, under the result of the majority opinion, it seems to me that all directors are employees and all officers are employees. Because a corporation can only act through its officers and agents, it will always be shielded against their fraudulent misrepresentation under a fidelity endorsement such as present here. I cannot agree that is the purpose of that endorsement. The majority takes a skewed view of the term "employee" to arrive at what it believes is an equitable result, i.e., between an insurer and a group of insureds, some of whom misrepresent, the insurer should always pay.

Finally, I dissent to Part III of the majority opinion concerning attorney fees. I adhere to my dissent in *State Farm Fire and Cas. Co. v. Sigman,* 508 N.W.2d 323, 327 (N.D.1993) [VandeWalle, C.J., dissenting]. To award attorney fees to HHI is to again award Holvik for his deception. Holvik should pay the fees for all parties since it was his actions which caused the law suit.

BERYL J. LEVINE, Surrogate Judge, concurs.